## PEOPLE v. HILL.

### No. 21,017; November 28, 1893.

#### 34 Pac. 854.

**Embezzlement—Evidence of Another Offense.**—On a prosecution for embezzlement, evidence that defendant, two months after the offense charged in the information embezzled another sum of money from defendant, is not admissible to show his intention in taking the first sum.[1]

---

[1] Cited in State v. Hall, 45 Mont. 508, 125 Pac. 644, where the principle was held not to apply to a case in which specific evidence is offered to show that the person charged had previously to and at the time of the transaction been indulging in similar dishonest conduct, which evidence must tend to throw light on the offense to which the trial relates.

APPEAL from Superior Court, Los Angeles County; B. N. Smith, Judge.

Claude L. Hill was convicted of embezzlement and appeals. Reversed.

M. E. C. Munday for appellant; Attorney General Hart for the people.

BELCHER, C.—The defendant was convicted of the crime of embezzlement, and the judgment was that he be punished by imprisonment in the state prison at Folsom for the term of three years. From this judgment and an order denying his motion for a new trial, he appeals. The information charges that on the tenth day of August, 1892, the defendant received from one Robert C. Brinkley, as his agent, the sum of $390, in lawful money of the United States, which he was to pay over to one W. E. De Groot for and on account of Brinkley, but that, in violation of the terms and objects of his agency, he did then and there, on the day named, "unlawfully, willfully, fraudulently, corruptly and feloniously retain, withhold, secrete, embezzle, and convert and appropriate to his own use," out of the $390 so received, the amount and sum of $300, whereby said Brinkley was deprived and defrauded of the said sum by the defendant. The appellant contends that the verdict was not justified by the evidence, and hence that the judgment should be reversed.

It was proved that Brinkley and defendant had been acquainted for twenty-five years. In February, 1892, defendant came to this state, and immediately went to the house of Brinkley, in Los Angeles, and remained there until September following, when he left for San Francisco, where he obtained employment. In May, 1892, Brinkley went east, and was there engaged and traveling about with a theatrical company. During his absence, defendant attended to his financial affairs, paid his bills, etc. Brinkley testified: "During the time I was in the east, Mr. Hill stayed at my house, and transacted my business for me here. He paid my family expenses. I sent the money to my wife, and she turned it over to him." And Mrs. Brinkley testified: "During my husband's absence, he sent me about $100 per month. Sometimes he sent the money

to me and sometimes to Mr. Hill to pay the family expenses. . . . . When Mr. Hill was at our house as our guest he was very kind. He took care of the children when they were sick, and looked after the household expenses. He paid the doctor's bills, the grocer, and he paid the electrician who put in the electric plant in our house. I never handled a cent unless he gave it to me. As soon as I got the money I indorsed it and gave it to him." Brinkley was indebted to De Groot on a promissory note which became due August 10th, and was secured by a mortgage on his household furniture. The amount due on the note for principal and interest at its maturity was $390. On July 20th he wrote defendant from Chicago: "By the way, my note to De Groot will be due on the 10th of August, and I have the money to meet it, and will send it to you as soon as I get back to Memphis. But if he will extend the note for three months longer by your paying the interest for three months $90, you had better pay Thiele, Clements and others, and I will be in a position to meet the note at the time. I don't know whether he will or not, but you had better try him." Again, on August 1st, he wrote defendant from Memphis: "You had better draw on me for the money to pay De Groot, if he won't wait and extend the note. If he will, you can pay the others. Has June got the money to go home on? I will bet she has not, so I will have to pay for her ticket, I suppose. Let me know, but don't push me too hard, as you know Will gets the bulk of the profits from the opera company and theater." On the 10th of August, Brinkley caused a telegram to be sent by a bank in Memphis to a bank in Los Angeles, directing the payment to defendant of $390, and the money was promptly paid. Shortly after receiving the money, defendant paid to De Groot $90 and he (De Groot) agreed to wait for the balance.

In October, Brinkley came to San Francisco and remained there about two weeks. While there, defendant was with him all the time, but nothing was said about the money. He then went to Los Angeles and there saw De Groot, and was told by him that only $90 had been paid on his note. After two days, he returned to San Francisco, and again met defendant and told him what De Groot said about the payment. Defendant said he had paid the whole debt, and he would go to Los Angeles and prove it. The two then went to Los Angeles

and met De Groot, and defendant and De Groot contradicted
each other and had a quarrel about the matter. The next day,
defendant told Brinkley that he had paid De Groot all the
$390, excepting $25, and that if Brinkley would let him have
that sum he would go over and pay De Groot and get a receipt
for the whole business. Brinkley gave him the $25, and he
went away, but returned shortly and said De Groot would not
accept the money. Brinkley owed Niles Pease $89, and he
then handed the defendant $64 more, and told him to go and
pay Pease. Defendant went into Pease's store, and when
he came out said to Brinkley: "Come on home, and I will tell
you something." They then got on a cable car and went home,
and Brinkley says: "In my parlor or library, he told me he
hadn't paid the money to De Groot. He said he had used
the money for other things. He didn't tell me right then what
he did with it. He told me later in the day." On cross-
examination, Brinkley testified: "A few days before this trial,
and after Hill's examining trial, I received . . . . a letter,
in Hill's handwriting, containing a list of things . . . . which
it was claimed he paid out money for. He never would tell
me before how he paid out the De Groot money I sent him.
I do not know that he paid for my sister in law's ticket when
she went east. Mr. Hill was attending to the payment of my
family expenses. I didn't know whether he paid out this three
hundred dollars for family expenses or not. I don't know
what he did with it. . . . . The only thing I know about it is
that Dr. Thiele was paid, and I didn't know until a few days
ago that he was paid. That was $50 that I owed Dr. Thiele.
I thought it was strange that he did not present his bill, and
I heard that he had been paid, and I went around to see him,
and he said that he had received fifty dollars. I didn't know,
as a matter of fact, that Mr. Hill ever took a dollar of my
three hundred dollars for his own personal purposes. I
couldn't tell what he did with it. I asked him, and he said
that he spent it. That is all." The defendant, in his own
behalf, testified: "With this $390 that I received, . . . . I
went immediately to Mr. De Groot, and paid this $90, this
interest, which I was to pay as soon as the money arrived,
and Mr. De Groot said it was all right, and he would allow
the principal to go on. I went immediately, and paid Dr.
Thiele $50, and paid this electrician claim of $17.50, and I

paid his sister's expenses back east, which amounted to a hundred and some odd dollars, and some small bills, drug bills, or something like that; and in that way the money was all expended for Mr. Brinkley's household expenses, and I received not a dollar benefit for myself. . . . . His debts here were very numerous. There was the grocer bill, doctor bill, electrician, and, well, most every kind of a bill that could go to make up household expenses, ranging from $10 up to $125, . . . . the general expenses, which amounted to between a hundred and twenty and a hundred and thirty dollars. He sent a hundred dollars per month expense money, but the general expenses run over that.''

The above is a brief statement of the material evidence in this case, and certainly it appears to be by no means strong or conclusive. Looking at all the evidence, it seems to us that the jurors might well have entertained a reasonable doubt as to whether the defendant was guilty or not. There was, however, some evidence, and the verdict cannot, in our opinion, be disturbed on appeal upon the ground that the evidence was insufficient to justify it.

Appellant further contends that several errors of law were committed by the court which also call for a reversal. One of these alleged errors only need be noticed. Brinkley testified, as before stated, that he handed defendant $25 and then $64, and told him to go and pay his debt to Niles Pease with it; that they shortly after went to his house, and defendant then told him that he had not paid the money to De Groot, but had used it for other things. Mr. Dupuy, the deputy district attorney, then asked the witness, ''When he told you that, what did you say to him, if anything?'' The question was objected to by defendant on the ground that it was immaterial, irrelevant and incompetent, and the objection was overruled and an exception reserved. The witness answered: ''I asked him to give back the eighty-nine dollars that I had given him to pay Pease, and he would not do it. He says: 'No, you have lost confidence in me, and I won't give you this money, and you go back to San Francisco, and leave me here in the lurch to hustle for myself.' '' During this argument of the case, Mr. Dupuy said to the jury: ''There was an embezzlement of the $89 he had given him to pay other debts.'' Counsel for defendant interrupted the attorney for the people, and

objected to any argument about the $89. The court said: "The Niles Pease matter, of course, cannot have any bearing upon the present charge, except, perhaps, since it was admitted in evidence as bearing upon the intent; but, even though he had absolutely embezzled that money of Pease, it has nothing to do with this case. But it is in evidence, and is a part of the evidence in this case, and, as bearing on the intent, I think counsel has a right to comment upon it." Counsel for Defendant: "My objection is that it cannot be a proof of intent, and of something that occurred in November, from which it is sought to prove or support the intent of something that occurred in August. He might have stolen a cow in November, and it would not prove intent in August." The Court: "This was brought as a part of the transaction and talk between the defendant and Brinkley. Objection overruled." Mr. Dupuy, continuing, then said: "The two transactions came together then, and while this young man was finding out the flood of this stream, the very flood involved in that stream commingled with it other infernal rascality of this defendant." The evidence objected to was clearly inadmissible. What the parties said about the $89 was not a part of the res gestae, and had no connection with the alleged embezzlement two months before. The prosecution had no right to introduce such evidence for the purpose of showing an intent to embezzle the $300, and its attorney had no right to comment upon it as a circumstance tending to show defendant's guilt. The rule is that every error is presumed to work injury, unless it appears that no injury could have resulted. That the defendant here might have been, and probably was, prejudiced by the erroneous rulings of the court, is quite apparent. It results, in our opinion, that the judgment and order appealed from should be reversed, and the cause is remanded for a new trial.

We concur: Vanclief, C.; Searls, C.

GAROUTTE and HARRISON, JJ.—For the reasons given in the foregoing opinion, the judgment and order appealed from are reversed and the cause is remanded for a new trial.

PATERSON, J.—I concur. The evidence relating to the defendant's retention of the $89 does not bring the case within

the decision in People v. Gray, 66 Cal. 275, 5 Pac. 240. "It is a dangerous species of evidence" in any case: Commonwealth v. Shepard, 1 Allen (Mass.), 581.