STATE, RESPONDENT, *v.* HALL, APPELLANT.

(No. 3,102.)

(Submitted April 29, 1912. Decided May 10, 1912.)

[125 Pac. 639.]

*Criminal Law—Larceny as Bailee—Information—Sufficiency— Evidence—Other Offenses—Hearsay Testimony—Cross-examination—Instructions—Felonious Intent.*

Larceny as Bailee—Information—Sufficiency.
    1. An information charging defendant with grand larceny, in that then and there having in his possession, as bailee and agent of one S., certain personal money, to-wit, money in a certain amount, fraudulently, feloniously, *etc.*, he appropriated the same to his own use, *etc.*, was sufficient as against the objection that it failed to set forth by direct averment that S. was the owner of the money.

Same—Information—Money—Description Unnecessary.
    2. An information charging larceny of money need not describe the money alleged to have been taken.

Same—Evidence—Admissibility.
    3. A note, the proceeds of which defendant was charged to have appropriated to his own use, was properly admitted in evidence, though not shown to have been indorsed by him, as explanatory of, and leading up to, other facts and circumstances in the case to enable the jury to understand how defendant, engaged, among other things, in

the business of making investments for others, transacted business with his clients.

Same—Evidence—Other Offenses—Admissibility.

4. The prosecution was properly permitted to prove other offenses of the same nature as that involved in the charge for which defendant was on trial, tending to show that he was engaged in a general plot or scheme to defraud his clients.

Same—Discretion.

5. The length of time over which an inquiry as to other offenses of the same nature committed by defendant may extend is a matter within the sound legal discretion of the trial court.

Same—Evidence—Sufficiency.

6. The release of a mortgage by defendant as attorney in fact of the mortgagee, *held* sufficient, in the light of other facts and circumstances in evidence, to warrant the conclusion that defendant actually received the amount of the mortgage which he stood charged with having appropriated to his own use.

Same—Hearsay Testimony—Harmless Error.

7. Error, if any, in allowing a witness to state that she had asked another person a certain question, was nonprejudicial where the answer of the person so interrogated was that he knew nothing about the matter.

Same—Evidence—Admissibility.

8. *Held,* that what a clerk in defendant's employ said and did in connection with the operations of defendant, in assisting the latter to defraud his customers, was competent evidence.

Same—Cross-examination.

9. Defendant having testified that a clerk in his employ had been elected a director of the corporation under the name of which he carried on business, but that such election was not had at a stockholders' meeting, a question whether he knew of any authority for electing a board of directors at a meeting other than a stockholders' meeting, *held* proper cross-examination.

Same.

10. Having testified on cross-examination that he (defendant) obtained some money from the corporation under the name of which he conducted business, with which to purchase a house, a question how much money he procured for that purpose was proper cross-examination.

Same.

11. After defendant had testified that he had paid some interest on notes sold to customers although indorsed "without recourse," a question whether, in his judgment, any obligation rested upon him to pay interest or to guarantee the payment of either interest or principal, was proper.

Same—Evidence—Harmless Error.

12. Defendant having testified substantially to the same thing without objection, his agent's statement that the company under the name of which he was doing business was short in a certain amount was nonprejudicial.

Same—Embezzlement—Instructions—Proper Refusal.

13. In a prosecution for larceny as bailee, an offered instruction on embezzlement was properly refused, no such crime being known to the laws of this state.

Same—Instructions—Settlement—Duty of Appellant.

14. Though the court in its instructions to the jury gave a defective

definition of the crime of larceny as bailee by omitting any reference to a criminal intent on the part of defendant, defendant will not on appeal be heard to complain that in this regard prejudicial error was committed, where he failed to offer a good instruction or point out the particular defect in the one given, a mere suggestion or calling attention generally to the fact that the instructions proposed to be given did not cover the point having been insufficient.

Same—Other Offenses—Instructions—Proper Refusal.
15. An offered instruction that evidence of other crimes committed by defendant was not sufficient to convict him of the particular one charged, was properly refused.

Same—Evidence—Sufficiency.
16. Evidence *held* sufficient to show that defendant had authority to collect the money which he appropriated to his own use.

*Appeal from District Court, Silver Bow County; Michael Donlan, Judge.*

SAM A. HALL, convicted of larceny as bailee, appeals from the judgment of conviction, and from an order denying his motion for a new trial. Affirmed, MR. CHIEF JUSTICE BRANTLY dissenting.

*Mr. J. R. Boarman,* and *Mr. W. B. Rodgers,* for Appellant, submitted a brief, and argued the cause orally.

Whenever evidence is introduced in a trial tending to show a distinct and separate offense from that charged in the information, it is error for the court to neglect to charge the jury as to the legitimate and proper effect of the evidence given of such distinct and separate offenses, from the offenses charged in the information. (*People* v. *Jacks,* 76 Mich. 218, 42 N. W. 1134; *State* v. *Lewis,* 19 Or. 478, 24 Pac. 914; *Thornley* v. *State* (Tex. Cr.), 35 S. W. 981; *Maples* v. *State,* 56 Tex. Cr. 99, 119 S. W. 105; *Jaynes* v. *People,* 44 Colo. 535, 16 Ann. Cas. 787, 99 Pac. 325.)

Neither the defendant nor Hall Brothers had any authority to collect the note. During all of the times when the transactions occurred, on or about the 28th day of February, 1908, when the state claims the crime alleged in the information was committed, it was in the possession of Christopher Stephens, who claimed to hold the same as the agent of Maggie Stephens. The proof utterly failing to show that the defendant had any authority to

collect it, then, even if it had been collected, the charge contained in the information would not be sustained, because to convict the defendant under the information herein, the proof must not only be sufficient to make out all the other material allegations in the information, but it must be sufficient to make out the allegation that the defendant did the acts charged in the information as the agent or bailee of Maggie Stephens. (*Pullan* v. *State,* 78 Ala. 31, 56 Am. Rep. 21; *Brady* v. *State,* 21 Tex. App. 659, 1 S. W. 462; *Moore* v. *United States,* 160 U. S. 268, 40 L. Ed. 422, 16 Sup. Ct. Rep. 294; *The Queen* v. *Negus,* 1 Am. Crim. Rep. 150; *Bartow* v. *People,* 78 N. Y. 378; *Coats* v. *People,* 22 N. Y. 245; *State* v. *Hutchinson,* 60 Iowa, 478, 15 N. W. 298, 4 Am. Crim. Rep. 162.)

The state also failed to prove one of the essential elements of the crime of grand larceny, which is, that the property must be appropriated without the consent of the owner, and the owner is an indispensable witness to prove such unlawful appropriation, and such testimony cannot be supplied by any other person, when the testimony of the owner of the property can be obtained. Maggie Stephens, the person named as the owner of the property in the information herein, did not appear as a witness, nor did she testify in the case, and so far as the proof shows, she might have been at the time of the trial within the jurisdiction of the court. (*State* v. *Moon,* 41 Wis. 684; *State* v. *Morey,* 2 Wis. 494, 60 Am. Dec. 439.)

The state having failed to show that the defendant had any authority to collect such note, the mere fact that the maker of it paid the amount of such note to an unauthorized person did not operate as a payment of the note. In this case neither the defendant nor Hall Brothers having any authority to collect the principal on such note, any attempted payment made to them would be unauthorized, and would not operate as a payment of the note. (Tiedeman on Commercial Paper, sec. 374.) Not only did the defendant not have any authority to collect the note, but the agent of Maggie Stephens had the note in his possession during all of the times within which it is alleged that the proceeds

thereof had been collected and embezzled. Clearly, there can be no pretense that any money belonging to Maggie Stephens was ever embezzled when no money was ever collected upon the note by anyone whomsoever.

*Mr. Albert J. Galen,* Attorney General, and *Mr. J. A. Poore,* Assistant Attorney General, submitted a brief in behalf of the State; *Mr. Poore* argued the cause orally.

MR. JUSTICE SMITH delivered the opinion of the court.

Defendant appeals from a judgment of conviction of grand larceny, and from an order denying his motion for a new trial.

1. The charging part of the information reads as follows: "That on or about the 28th day of February, 1908, the defendant [1] Sam A. Hall, then and there having in his possession, custody and control, as bailee and agent of Maggie Stephens, certain personal property, to-wit, money, in amount and of the value of five hundred and sixty-four and 50/100 dollars ($564.50) lawful money of the United States, did willfully, unlawfully, knowingly, fraudulently, intentionally and feloniously appropriate said money to his own use, with intent in him the said Sam A. Hall, then and there to deprive and defraud the true owner, the said Maggie Stephens, of her property and of the use and benefit thereof." It is contended that the county attorney has failed to set forth by direct averment that Maggie Stephens was the owner of the money. We think the information is sufficient. A person of common understanding would undoubtedly know, from reading it, that it was intended to so charge. That is the [2] criterion. (Rev. Codes, sec. 9147.) It was not necessary to describe the money. (Rev. Codes, sec. 9164.)

2. It appears from the state's evidence that Hall Brothers, a corporation, was engaged in the insurance, real estate and other business in Butte; the defendant was its president and also attorney in fact for one Frank E. Southmayd, who resided in Wisconsin. On August 29, 1906, Christopher Stephens, brother of Maggie Stephens, visited Hall Brothers' place of business and

procured a note for $564.50, dated June 28, 1906, due ten months after date, payable to the order of Frank E. Southmayd, signed by Joseph P. and Annie Wynne. The defendant and one Wigginton were present at the time. Stephens paid $564.50 for the note, and it was thus indorsed: "Without recourse pay to the order of Maggie Stephens. (Signed) Frank E. Southmayd by S. A. Hall, attorney and agent in fact." Not anything was said at the time by the defendant as to how the note should be paid or collections made on it. Stephens continued to go to Hall Brothers' place of business every month and collect one per cent interest on the sum evidenced by the Wynne note and also on twelve other notes, of various persons, which he procured or purchased at different times at the same place and under substantially similar circumstances. Some of these notes were purchased from the defendant personally. At times he was present at the transaction and sometimes not. Occasionally he paid the interest himself and made the indorsement; at other times it was paid by Wigginton. Nothing was ever said as to whether the Wynnes had paid interest on their note or as to where the interest came from. In August, 1910, Stephens went to Hall at his office, and, as narrated by the former, this conversation, in substance, was had: "I told him that I had three or four notes I bought off him in 1906 and I was going to call them in; and to that he told me he had called in quite a number of notes. I asked him what he did with the money and he told me he paid it out here and there. He said his big creditors were rushing him, and he said, 'You won't get anything out of it and I won't,' and he says, 'I will take all your notes you have got and you take my personal note.' He says: 'I will give you a note and pay you $1,000 in one year and another note in eighteen months and another in two years, and so on until I get you paid.' He told me he had lots of assets that would amount to more than the liabilities and he would settle up as soon as he could. So I never got a cent from him since that time. He stated he had collected the principal on all those notes I had." The notes all ran to Frank E. Southmayd and were indorsed as was the Wynne note. Stephens never noti-

fied the makers of the notes to pay the interest directly to him. Once or twice Hall complained that some of the parties were not paying interest regularly, but he always paid it himself whether he had received it or not. Stephens also testified: "There were three notes I told him to collect for me. The first note I had him collect for me was in 1907 or 1908. That note was taken up. He collected the principal on that note and notified me and I brought down the note and he gave me the principal. I had a conversation with him relative to collecting the principal on the notes introduced in evidence marked 1 to 13 for identification; I went to Hall last May or June, 1910, and I told him I had three notes outstanding since 1906; and I requested him to call them in and I mentioned the notes, and he told me he would see the parties and have them pay the principal on these notes. Those were the Wynne note, the Mattock note and the Hornbeck note. So I went to him later, and he told me he was doing all the business himself at that time and was so busy he could not get around to see the parties; I went there three or four times; and one time he told me that he saw the parties and as soon as they could raise the money they would come in and pay them. That was about a month before he told me he had collected the principal and put it here and there. This note of $564.50, signed by Joseph P. Wynne and Anna Wynne, which is the one set out in the information and which I claim Sam Hall embezzled—if that money was paid by the Wynnes in February, 1908, to Sam Hall, I had not told Sam Hall to collect it, but I authorized his agent; I authorized his agent Wigginton to collect it, but I did not tell Sam Hall personally. If that money was paid to them it was authorized by me; it was authorized by me in 1907; I told Mr. Wigginton, and Wigginton was working for Sam Hall. In August Hall told me each and every one of those notes had been paid. That is what he told me, that every one of those notes had been paid. He told me he had collected the principal on all the notes I held."

Nellie Jory, bookkeeper for Hall Brothers, testified: "The method of keeping account as to those outstanding notes of

Maggie Stephens was that the makers of the notes continued to pay the interest at Hall Brothers; we collected the interest and we paid it to him. The $564.50 Wynne note was paid on the 28th day of February, 1908. Assuming that was paid on the note indorsed to Miss Stephens, and we had the money belonging to Miss Stephens, we would not enter it as a credit in the Maggie Stephens account, not until we paid it over to Stephens. I don't know why it was not turned over. After Hall Brothers had received this money from Mrs. Wynne and in payment of the Stephens note, I do not know why it was not credited to Maggie Stephens or Chris. Stephens. As a matter of fact, Hall Brothers had received $564.50, money which was paid by the debtor on a note which Stephens held. Mr. Hall knew that I was receiving money on those notes and not giving the holder of the note credit in his account. I carried everything reading to Frank E. Southmayd under the name of 'S. A. Hall, general.' The 'S. A. Hall, general' account is a bills receivable account to Hall Brothers. So far as I know there was no account whatever with Frank E. Southmayd. The personal account of Sam Hall was carried in the name of A. F. Hall, his sister. The Stephens account never showed the amount of money that had been paid in for him.''

There is an abundance of evidence in the record to warrant the conclusion that Hall Brothers, the corporation, was simply a cloak or cover for the operations of the defendant Sam A. Hall. The latter testified: ''Whenever I needed any cash I drew on the account of Hall Brothers and charged myself with it; when I needed money I got it there because when I got money in return I paid it back there. As each one of these notes was made it was made to Frank E. Southmayd. The loans were taken in his name for the purpose of convenience and to save a heavy tax and I was attorney in fact for him. Whenever one of these parties, for instance, Mr. Wynne, or other parties would come in and pay the principal on a note, that would be deposited at the Daly Bank in Hall Brothers' account. I always had access to that bankbook. I was not handling the account with the bank but I was

interested in it. The firm was drawing money on the strength of it and declaring dividends to various parties out of Hall Brothers' assets, and I was getting credit for mine. We never notified any of these people that the principal of their notes had been collected. Hall Brothers agreed to pay the interest on these notes. That was the usual custom when money was paid in there; we paid the interest. Mr. Stephens looked to us for the interest on that money. The money that Stephens had in there it was understood that he was getting one per cent per month. I have no knowledge as to how much shortage there is in our accounts, due to this failure to turn over moneys which were collected on those notes. I do not think it is over $40,000.''

Wigginton testified: ''Every nickel that was paid in there Hall knew about. I think there never was an instance to my knowledge where the party that held the note was notified that the principal was paid. I suggested to Hall that money was paid in by a certain party and this money should be paid over. He was highly insulted and said, 'I will guarantee every note that is sold in that office; it is none of your business.' I know that when Wynne came in and paid his note, we made an entry in the Wynne account showing that he had paid the note, but we made no entry in the Stephens account showing that $564.50 or any other sum was received for Stephens' benefit upon the Wynne note. I called Hall's attention to the principal on these notes being paid, and told him they should be advised of the payment of the principal. I did not see anything crooked in Hall's buying an automobile or piano and other transactions, but the money was coming out of Hall Brothers; I knew that the money should have been in Hall Brothers and should have been paid to the people to pay the notes, the holder of the notes; it was to them the money should have been paid. I called his attention to it two or three times—to various notes.''

3. It is contended that the court erred in admitting the Wynne note in evidence for the reason that it was not shown the defendant had indorsed it or delivered it to Stephens. This contention [3] is disposed of by reference to the testimony of Stephens that

the defendant admitted having received and converted the principal of the note to his own use. The note was properly received in evidence as explanatory of, and leading up to, other facts and circumstances in the case, to enable the jury to understand the relations existing between Hall and his customers or clients. and their manner of transacting business. It was sufficient to show by any competent testimony how the note in question came into the possession of Stephens, through the medium of Hall Brothers, the subterfuge employed by the defendant for cloaking his nefarious operations. It was of no consequence who indorsed it or transferred it. As a matter of fact, however, the indorsement was probably made by Wigginton, who testified that he had full authority from Hall for all his actions.

Again it is argued that there is no evidence to prove that any money was ever collected on the note. We have quoted sufficient testimony, we think, to show that this point is not well taken. Let us make it plain from the outset that in our judgment there is ample evidence that the corporation Hall Brothers, in all the transactions set forth in the record, was simply a disguise for Sam A. Hall; and that his own confession to Stephens was sufficient proof that he actually and personally received and converted the principal of the Wynne note.

4. It is contended that the court erred in allowing the state [4] to prove other offenses of the same nature as that involved in the specific charge. All of these transactions were consummated through the medium of Hall Brothers, and ranged in time from prior to February 28, 1908, to January 28, 1909. They were numerous, and flagrant of felonious intent and criminal conduct. The transaction of the Wynne note was clearly proven to have been one of a class of similar dealings on the part of the defendant through the agency of Hall Brothers. All of them had similar features. A course of conduct was proven by which the defendant converted to his own personal use the moneys of those who dealt with the Hall Brothers corporation. All of these several felonies appear to have been part of a general scheme or plot to defraud the unsuspecting and credulous people of Butte

and elsewhere, who could be induced to leave their money with Hall Brothers by promises of large returns thereon in the way of interest; and others who, through false and fraudulent representations were persuaded to pay their outstanding obligations without receiving back the evidences thereof, which had in fact been transferred to others without their knowledge. Some of these fraudulent schemes were somewhat different, in details, from others, but all possessed common features indicating a [5] common design. The length of time over which the inquiry should extend was within the sound legal discretion of the trial court. (*Spurr* v. *United States*, 87 Fed. 701, 31 C. C. A. 202.) We find no error in the admission of the testimony and no abuse of discretion. (See 1 Wigmore on Evidence, secs. 304, 315, 316; 12 Cyc. 411.) The author of the article in Cyc. says: "This rule is often applied where the crime charged is one of a series of swindles or other crimes involving a fraudulent intent, for the purpose of showing this intent."

The district court of appeals of California in the Ruef case (*People* v. *Ruef*, 14 Cal. App. 576, 114 Pac. 48, 54) said: "The rule is that where several crimes are connected as part of one scheme or plan, all of the same character, and tending to the same common end, they may be given in evidence to show the process or motive and design leading up to the particular crime for which the prisoner is being tried, and thus directly tending to show logically that the crime in question was a part of such common scheme. If the several crimes are part of a chain of cause and consequence so linked as to be necessarily connected with the system or general plan, they are admissible." The case of *People* v. *Hill* (Cal.), 34 Pac. 854, is not in point. That case involved two separate and distinct transactions, neither of which could have shed any light upon the other.

In the case of *People* v. *Bartnett* (Cal.), 113 Pac. 879, cited by appellant, the defendant was accused of embezzling certain bonds. The court compelled the prosecuting attorney to elect which particular offense he would rely upon, and afterward instructed the jury that if they believed the defendant had aided or abetted

in the sale or disposition of any of the bonds, it was their duty to convict him. This instruction was properly held to be erroneous. The trial court also advised the jury to consider the sales of other bonds, for the sole purpose of determining the intent of the defendant, but the appellate court declared that this instruction was simply in conflict with the former and did not cure the error therein.

5. The error, if any, in permitting the witness Atkins to testify that Stephens demanded payment of his note and asked to see his receipts, was immaterial and nonprejudicial in view of defendant's admission to Stephens that he had collected all of the notes, and his virtual confession while a witness, that the proceeds thereof had been received and converted.

6. The witness Annie Harrington testified, over objection, that she loaned the defendant personally $2,980; that he gave her a paper that was worthless, that was "no good." She appears not to have been very alert mentally. Two real estate mortgages, one for $184 and another for $1,500, were received in evidence. Both ran to Frank E. Southmayd, and were assigned by Hall, as attorney in fact, to Daniel D. Harrington, a brother of the witness. She testified that the principal of neither mortgage had been paid over by Hall to her brother. It was shown by the records in the office of the county recorder that defendant had satisfied the $1,500 mortgage of record, certifying that it had been fully paid. While the scheme to defraud disclosed by the foregoing evidence is somewhat different, in some of its details, from that practiced upon Stephens and others, we are of opinion that it falls within the general plan that was being carried forward by the defendant, and the evidence was competent.

7. There was no prejudicial error in the action of the court in admitting in evidence the mortgage for $184 above mentioned, and the assignment thereof to Harrington. No showing was made that Hall had received the sum secured by the mortgage. The evidence was simply immaterial.

8. We think the $1,500 mortgage and the assignment thereof were properly admitted in evidence. The whole affair discloses

the fact that after assigning the mortgage to Harrington he collected it himself and kept the money. Annie Harrington testified positively that Hall had never paid over any of the proceeds to her brother, who appears to have been her agent in the transactions. Counsel are mistaken in supposing that she testified she knew nothing of the fact of nonpayment to Harrington. What she did admit was that she knew nothing personally as to whether Hall had collected the principal of the note. That was shown by the record, as aforesaid. Our attention has not been called to any testimony by the defendant, while on the stand, wherein he denied having received the proceeds of this note and mortgage, or asserted that he had paid them over to either of the [6] Harringtons. We think the release of the mortgage by the defendant as attorney in fact for Southmayd, who appears to have been simply a convenience or "dummy" employed by him to carry out his schemes, coupled with other facts and circumstances in the case, was sufficient to warrant the conclusion that Hall actually received the amount of the mortgage debt from the mortgagor.

9. There is no merit in the contention that the court erred in admitting in evidence certain receipts produced by the witness Atkins, purporting to show that a note executed by him to Southmayd and afterward transferred to Christopher Stephens had been paid. As we have already stated, Hall's confession to Stephens that he had collected and converted the proceeds of all the notes held by the latter, sufficiently established that fact. Moreover, we are of opinion that in the light of the evidence as to the manner of operations employed by the defendant, through the medium of Hall Brothers corporation, Wigginton and his sister, the receipts were competent evidence of the fact of payment.

10. The witness Frances J. Atkins, wife of C. D. Atkins, testified that having paid a note to Hall she demanded the "original," but he gave her a "renewal"; that he promised to send the "original" by mail but never did so. She afterward asked Wigginton if he knew where "the original" note was, and he

replied he knew nothing about it. Objection was made to her statement that she made inquiry of Wigginton, but in view of [7] the answer that he knew nothing about the matter, there was no prejudice. Other portions of the testimony of this witness, which are now claimed to be incompetent, were received without objection. We are clearly of opinion, moreover, that [8] what Wigginton said and did in connection with the operations of Hall Brothers and the defendant, in assisting the latter to defraud his customers, was competent evidence.

11. When the defendant took the stand as a witness in his own behalf he made an effort to create the impression that Wigginton [9] was responsible for the manner in which the affairs of Hall Brothers were conducted. He testified that Wigginton held stock in the corporation and was its secretary and treasurer. On cross-examination the state attempted to show that this latter statement was untrue and Wigginton subsequently denied the truth thereof. The defendant declared it was not at a stockholders' meeting that Wigginton was elected as a director. He was asked: "Do you know of any authority for electing a board of directors at a meeting other than a stockholders' meeting?" He answered, over objection, that he believed the by-laws of the corporation made such a provision. We think this was proper cross-examination.

12. Defendant testified, without objection, on cross-examina- [10] tion, that he got "some money once [from Hall Brothers] to buy a house with." He was then asked: "How much money did you get for that purpose?" The question was objected to as incompetent and not proper cross-examination. He answered that he paid $4,250 for the house; that he took it from Hall Brothers and charged his account with it. We find no error in the ruling of the court. The question propounded was proper cross-examination, after defendant had testified that Wigginton was an officer of the corporation and had exclusive charge of its business. It was competent to show that defendant was using the moneys of the corporation as his own.

13. Defendant testified that he did not know a certain note, executed by one Carter and secured by mortgage, had been paid until after the failure of Hall Brothers. He then identified his signature to a satisfaction of the mortgage dated the 30th day of December, 1908. The mortgage from Carter and wife to Southmayd, together with the release and satisfaction thereof, executed by Hall as attorney in fact for Southmayd, were then received in evidence over his objection. No error.

14. Defendant, having testified that he did not notify any of the holders of notes that the same had been collected; that "the [11] firm" was paying some interest; that he might have signed "those checks" every now and then; that they paid Stephens a check for the interest he had coming, although the notes were all indorsed "without recourse"—was properly compelled to answer whether, in his judgment, any obligation rested upon him to pay interest or to guarantee the payment of either interest or principal. He answered that he was advised by counsel that there was a liability on the part of Hall Brothers.

15. Wigginton's testimony that Hall Brothers were short $39,000 or $40,000 was competent to corroborate Stephens' [12] statement that Hall admitted having collected all the notes and having paid the proceeds out "here and there." There could be no prejudice in receiving the evidence in any event, as the defendant testified to substantially the same thing without objection.

16. Specifications of error Nos. 32 and 33 relate to testimony to which no objection was interposed at the trial.

17. The state's witness Karsted testified that he had had dealings with Hall. He was then requested to state what those dealings were. Over objection he answered: "I loaned out some money, about $3,000, to Mr. Hall and he never paid back a cent. He admitted that he collected money for me or on my account. I asked him point blank whether he had collected money for me and he said he had. He collected from a number of loans that I had—a number of parties in the city to whom I had given out loans—that is, which he had given out loans." The witness

then named six persons to whom he had loaned money, and then continued: "The notes of those various parties whose names I have just stated were held by me; I was the owner of those notes. Hall had authority to collect the interest and principal. He admitted to me that he had collected them; I asked him what he had done with the money and he would not admit what he had done with it; he didn't turn it over to me. I never authorized him to make any other disposition of the money than to turn it over to me. Prior to that time I was not aware that these notes had been paid to Mr. Hall or that he had the money." It is contended by counsel for the defendant that this testimony shows a perfectly innocent transaction, involving no criminality. To our minds, however, the jury were justified in believing that Karsted was the victim of a series of embezzlements similar to the one charged in the complaint.

18. Karsted also testified on cross-examination, in answer to the inquiry: "Mr. Hall admitted that the payments came to him?" "He did, and he admitted that $6,000 of my mother's notes had been paid in and he could not show the money—six thousand of my mother's." The court refused to strike the answer, and it is now urged that in his direct examination he had said nothing about his mother's money. The answer was not strictly responsive to the question, but we find no prejudicial error.

19. The witness, on redirect examination, was asked: "What notes did you refer to as your mother's notes?" He answered: "I have a list of them here; I made the memorandum myself and know it is correct." He was then, properly, we think, allowed to read off a list of the makers and amounts of twenty promissory notes, aggregating $5,069.12. The objection becomes altogether immaterial when we reflect that Hall admitted a shortage of some $40,000, and the witness Karsted testified that he admitted to him that he had collected the principal on all of the notes mentioned.

20. Specification of error No. 39 goes to the refusal of the court to direct a verdict of acquittal. What is hereafter to be said,

taken in connection with what we have already determined, will dispose of this assignment.

21. It is contended that the court erred in neglecting and refusing to instruct the jury as to an essential element of the crime of larceny, to-wit, the felonious appropriation of the property. Error is assigned on the refusal to give three instructions which are claimed to correctly state the law relating to the necessary ingredients of the crime. The offered instructions were numbered 2a, 4a and 5a. 2a did not directly raise the [13] point, and 4a attempts to define a crime called "embezzlement." There is no such crime known to the laws of this state. 2a also is not a correct statement of the law relating to the crime of larceny as bailee; but, even so, we are of opinion that the substance thereof was sufficiently covered by other instructions.

The best that can be said of 5a is that it suggests the necessity of instructing the jury that a felonious intent is necessary to constitute a crime. The first part of the instruction is so framed as to be confusing and almost meaningless. Certain words appear to be omitted therefrom. The expressions "simple larceny" and "embezzlement" are found therein, but the crime of which the defendant was accused is not mentioned, save in the last sentence, and it is there coupled with the declaration that the "*taking* or conversion of personal property which renders a person guilty of *simple larceny or of embezzlement* is a *feloniously* taking or conversion." The defendant was not charged with a felonious "taking." We think the court was justified in refusing this instruction, for the reason that, if given, it would have had a tendency to confuse the jury, rather than to enlighten them.

Counsel argue: "The court's attention, by these instructions, [14] was called to the proposition that the word 'feloniously' or some equivalent word or language is absolutely essential to a correct instruction where the crime of grand larceny is charged." They cite *State* v. *Peterson,* 36 Mont. 109, 92 Pac. 302, *State* v. *McLeod,* 35 Mont. 372, 89 Pac. 831, *State* v. *Sloan,* 35 Mont. 367, 89 Pac. 829, *State* v. *Allen,* 34 Mont. 403, 87 Pac. 177, and *State*

v. *Rechnitz,* 20 Mont. 488, 52 Pac. 264, in support of their contention. The question arises, therefore, whether under our system of settling instructions, a defendant in a criminal action may, without tendering one which is correct in point of law or which should have been given, or by offering one which is incorrect, predicate error upon the refusal of the court to give a correct instruction or any instruction on the subject, by simply suggesting or calling attention generally to the fact that the instructions proposed to be given do not cover the point.

For the purposes of this action we shall assume that it is the duty of the trial court to charge the jury of its own motion in a criminal case, and that the charge should substantially cover the main issues, so as to enable the jury to intelligently decide them. This does not mean, however, that the court must, without request, cover every point in the case, or explain every issue, or deliver a charge so comprehensive in scope as to be beyond fault or criticism. If such were the law very few criminal convictions could stand. In the instant case, the court, of its own motion, gave many instructions to the jury. The information charges that the defendant feloniously appropriated the money of Maggie Stephens to his own use. The jury were instructed (1) that his plea of not guilty made it incumbent upon the state to prove all of the material allegations contained in the information beyond a reasonable doubt, and that the evidence must be sufficient to establish every element of the crime charged; (2) that if they entertained any reasonable doubt upon any single fact or element necessary to constitute the crime, it was their duty to acquit; (3) that in every crime there must exist a union or joint operation of act and intent. The court also defined the crime of larceny as bailee in the words of the statute. As is well known to the profession, this definition is defective in that it omits any reference to a criminal intent. Grand larceny was also defined. Altogether nineteen instructions were given. So it appears that the court made a reasonable effort to advise the jury of the issues in the case and the constitutional rights of the defendant. They were also given the usual and ordinary rules for their guidance

in weighing evidence and determining the credibility of witnesses. The instruction defining larceny as bailee was given without objection. It was defective. The legislature has endeavored to minimize reversals in criminal actions growing out of the charge, or failure to charge, by the court, by enacting section 9271, Revised Codes. That section provides, among other things, as follows: "When the evidence is concluded, if either party desires special instructions to be given to the jury, such instructions shall be reduced to writing * * * and together with a written request asking the same * * * delivered to the court. At all times prior to the charging the jury the instructions to be given shall be * * * settled by the court, at which settlement counsel for the parties shall be allowed reasonable opportunity to examine the instructions requested and proposed to be given by the court and to present and argue to the court objections and exceptions to the adoption or rejection of any instruction offered by counsel or proposed to be given to the jury by the court. On such settlement of the instructions the respective counsel, or the parties, shall specify and state the particular ground on which the instruction is objected or excepted to, and it shall not be sufficient in stating the ground of such objection or exception to state generally that the instruction does not state the law, or is against law, but such ground of objection or exception shall specify particularly wherein the instruction is insufficient, or does not state the law, or what particular clause therein is objected to. * * * No motion for a new trial on the ground of errors in the instructions given shall be granted by the district court unless the error so assigned, was specifically pointed out and excepted to at the settlement of the instructions, as herein provided; and no cause shall be reversed by the supreme court for any error in instructions which was not specifically pointed out and excepted to at the settlement of the instructions * * * and such error and exception incorporated in and settled in the bill of exceptions. * * * In charging the jury, the court shall give to them all matters of law which it thinks necessary for its information and guidance."

The spirit as well as the letter of the foregoing provision is that general requests and objections are to be disregarded both by the trial court and by this court. The purpose of the legislature was that the attention of the trial court must be specifically directed to any alleged defect in a proposed instruction, and requests for particular instructions must be reduced to writing and delivered to the court. Ample time is given for examination of the court's proposed charge, to the end that specific objections may be made thereto. The particular ground of objection must be stated and general objections are not sufficient. The objection must specify particularly wherein the instruction is insufficient or does not state the law. It will readily be seen, therefore, that a suggestion contained in a defective offered instruction is not sufficient to constitute a specific objection to another instruction proposed to be given by the court. Not having offered a good instruction and having failed to point out the particular defect in that of the court, the defendant cannot be heard to say that the trial court erred to his prejudice. The statute forbids this court to grant a reversal in the circumstances.

22. Defendant's instruction No. 3a was refused. It reads as follows: "You are instructed that considerable evidence was admitted with reference to transactions other than the larceny [15] of $564.50, and in this connection the court instructs you that even if there may be evidence that the defendant Sam Hall converted other money at other times to his own use, this is not sufficient evidence to find the defendant guilty, and you are instructed that unless you are satisfied beyond a reasonable doubt, that the defendant Sam Hall committed the crime of grand larceny and appropriated, as is set out in the information, the sum of $564.50, or some part thereof, belonging to Maggie Stephens, then you must find him not guilty." It is now argued that this instruction was intended to advise the jury that evidence of other crimes was only to be considered as bearing upon the question of intent. Many cases are called to our attention holding that the court should inform the jury, on request, that such evidence must be so limited in effect. But the instruction offered did not so limit the effect of the evidence. It told the

jury that evidence of other crimes was not sufficient to convict the defendant of the particular crime charged. This of course was true. But the evidence was nevertheless competent, as we have heretofore shown. To have given this instruction as offered would almost have amounted to a direction to disregard the evidence. If counsel desired the court to charge the jury that evidence of other similar offenses was only admitted to guide them in determining the intent of the defendant, they should have made a specific request for such an instruction. The record shows that the court told the jury, when the evidence was offered, that it was only admitted as bearing on the question of intent.

23. Again, it is contended that the verdict is not supported by the evidence, in that there was no showing that the defendant, or Hall Brothers, had authority to collect the Wynne note. The gist of the argument is that if the defendant converted any money, it belonged to the Wynnes and not to Maggie Stephens. There is no merit in this contention. Stephens was the agent for his sister. He had power to act for her. As early as 1907 he gave authority to Wigginton for Hall Brothers to collect the Wynne note. He so testified. Hall Brothers, while ostensibly the title of a corporation, was in reality the name under which the defendant was carrying on his operations. Wigginton was its agent and his agent. Acting on such authority, Hall Brothers collected the Wynne note and the defendant appropriated the proceeds thereof to his own use. He confessed as much to Stephens. He knew every detail of the business. He was informed that the makers of notes were paying the amounts thereof into the office of the corporation. He knew that these amounts were being deposited in the Daly bank to the credit of the corporation, and he treated the moneys so deposited as his own personal property. Wherever the technical title to these moneys may have rested, as between the makers and indorsees of the notes, the fact remains and may be gathered from a multitude of circumstances disclosed by the record, that Hall encouraged the makers to pay the interest and principal of their notes to him, assuming the right to collect the same. He collected and paid over to Stephens the interest on the Wynne note from the time of

its purchase by the latter, assuming to act as the agent of Maggie Stephens. It seems to have been understood between him and his victims that he should collect the amounts due and hold the same as bailee for the owners of the notes. The proceeds of one note was paid to him as agent for Stephens and he subsequently turned the amount over to the latter. When Stephens desired to call in notes for payment he went to Hall. The whole course of conduct of the defendant, his agent Wigginton, Stephens, and the Wynnes, shows that Hall not only assumed, but that he actually had, authority to collect the Wynne note. His confession to Stephens and the attempt to induce the latter to take his notes in payment of the amounts of which he had defrauded him and his sister, clearly shows that the defendant himself never questioned his authority to collect the note.

24. Finally it is urged that there is not any testimony in the record to show that Maggie Stephens did not consent to the appropriation by the defendant of the proceeds of the Wynne note. Maggie Stephens did not appear in the case as a witness or otherwise. Her brother was her agent with full power to act in her behalf. He purchased the notes and collected the interest. He testified that the defendant was never given authority to convert the proceeds of any of the notes to his own use. Hall virtually confessed as much in the conversation with Stephens to which we have just referred. He was palpably guilty of the crime charged, and although there were many technical errors committed at the trial, we are clearly of opinion that he was properly and justly convicted.

The judgment and order are affirmed.

*Affirmed.*

Mr. Justice Holloway concurs.

Mr. Chief Justice Brantly: I cannot agree with my associates in the disposition made of this case. I think the defendant is entitled to a new trial. In my opinion the evidence does not show that the money alleged to have been appropriated by the defendant belonged to Maggie Stephens. To sustain the verdict it was indispensable that this fact be established.

The court submitted the case to the jury without giving them any definition of larceny, other than that embodied in the statute. This court has repeatedly held, as appears from the case of *State v. Allen* and the others cited in the majority opinion, that this is not sufficient. It is true that counsel for the defendant did not submit a properly drawn request for an instruction covering the point, yet I think the requests submitted indicated clearly what the desire of counsel was, and that the court should of its own motion have submitted a proper instruction. Even under the liberal rule prescribed by the statute (Rev. Codes, sec. 9271) a trial court cannot neglect the duty to give such instructions as will enable the jury to find properly with reference to each element of the crime charged. Under the instructions as given, the jury were justified in finding the defendant guilty upon the theory that his appropriation of the money was wrongful though not felonious.

Rehearing denied June 4, 1912.