**210 P.2d 972**

**STATE v. VOECKELL.**

**No. 993.**

Supreme Court of Arizona.

Nov. 2, 1949.

Nolen L. McLean, of Tucson, attorney for appellant.

Fred O. Wilson, Attorney General, Maurice Barth, Asst. Atty. Gen., Charles Rogers, Asst. Atty. Gen., Bryce H. Wilson, Pima County Atty., Tucson, Attorneys for appellee.

LaPRADE, Chief Justice.

The defendant (appellant) Charles B. Voeckell, age 26 years, was convicted in the superior court of Pima County upon both counts of an information charging him with (1) assault with intent to commit murder upon the person of Richard Y. Ginter, and (2) assault with a deadly weapon upon the latter's wife Beverly Ginter. The two crimes grew out of the same set of circumstances. After denial of a motion for a new trial, judgment was pronounced sentencing the defendant to serve 20 to 25 years on the first count and 5 to 6 years on the second count, the sentences to run consecutively. This appeal followed.

The facts out of which the prosecution arose are as follows. On or about the 12th day of November, 1948, a Mr. and Mrs. Richard Y. Ginter were returning from a hunting trip in Sabino Canyon, Pima County, Arizona, and while coming down a mountainside, met defendant. As they passed each other, Mr. Ginter and defendant exchanged greetings and defendant asked if they had seen any deer, to which inquiry Mr. Ginter replied that they had seen several does but no bucks. Voeckell's response was, "There aren't any deer in these hills." The Ginters continued on their way down the canyon and thought defendant continued on up the canyon, but a few minutes later defendant returned to their car where they were packing up preparatory to returning to Tucson. Defendant, noticing that Ginter had left an 8 mm. German rifle leaning on the fender of his car, remarked that it was a bigger gun than his, inquired if it was loaded, manipulated the bolt mechanism, and looked into the magazine. After defendant had finished examining the gun, Ginter placed it in the back of his car. While he was so engaged defendant got behind him and pointing his .30-30 gun at his chest commanded him and Mrs. Ginter to start moving, which they did, defendant following close behind. Ginter asked defendant several times where

he wanted them to move; defendant said, "Over there," pointing to a ravine. Ginter turned around and grabbed defendant's .30-30 gun, pulling it down to the ground, at which time defendant fired, hitting Ginter in the foot. Defendant then pushed the stock of his gun into Ginter's head, stepped back, pulled out a .22 pistol, and shot Ginter several times, two of the shots hitting him in the face and one in the hand.

While defendant was firing at Mr. Ginter, Mrs. Ginter entered into the struggle to aid her husband. Defendant hit her over the head with the pistol, fired one shot at her, the bullet grazing her elbow, and pointing the gun at her chest pulled the trigger twice, but both shells misfired. During this melee Ginter arose from the ground, grabbed Voeckell, and finally subdued him by hitting him over the head with the butt of defendant's gun. While the Ginters were preparing to leave, defendant started to arise, whereupon Ginter hit him on the head again, rendering him unconscious, and departed. Upon regaining consciousness appellant stealthily found his way home by backway trails, hiding from airplanes searching for him and dogs trailing him.

The following day (November 13th) two criminal complaints were filed in the justice court charging him with assault with intent to commit murder and assault with a deadly weapon.

On November 16, 1948, in the superior court of Pima County insanity proceedings were instituted against defendant by a complaint signed by his mother, which is still pending. After preliminary hearing on November 19, 1948, the accused was bound over for trial, and thereafter on the same day, two informations were filed charging the two offenses. Following a plea of "Not Guilty" as to both counts, the case was set for trial. A notice of intention to present insanity as a defense was served on the county attorney, and subsequently a motion for examination to determine the then mental condition of the defendant was granted by the court. An examination was made by three court-appointed doctors, two of whom testified that defendant was competent to aid his attorney in his defense and understood the nature of the proceedings instituted against him, the third doctor being of the opinion that he was deficient in both respects. At the conclusion of this preliminary hearing, the court concluded that he was sufficiently capable of understanding the nature of the charges against him and able to assist his counsel in his defense, and ordered him to trial.

On the trial no attempt was made by defendant or his witnesses to deny any of the charges against him. All of the evidence of defendant was directed toward establishing that at the time of the commission of the acts charged he was so insane as not to be able to distinguish between right and wrong. Evidence pro and con respecting the sanity of the accused was given by both expert and lay witnesses on behalf of defendant and the state. The jury com-

menced their deliberations at 4:05 p. m., Saturday, January 8, 1949. On Monday, January 10, 1949, at 8:10 p. m., the jury was called back for additional instructions—52 hours and 5 minutes after the matter had first been submitted. The jury had not communicated with the judge or indicated that they were unable to agree, and had asked for no additional instructions; nor did the court make any inquiry as to how the jury stood. The judge, exercising what he considered to be a sound, legal discretion, proceeded voluntarily to instruct the jury as follows:

"Members of the jury, I am going to give you a further instruction in this case. You are further instructed, members of the jury, that although the verdict to which each juror agrees, must, of course, be his own verdict and the result of his own convictions and not a mere acquiescence in the conclusion of his fellows, yet in order to bring twelve minds to a unanimous result you must examine the question submitted to you with candor and with proper regard and deference to the opinions of each other. There is no reason to suppose that this case will ever be submitted to twelve more intelligent, more impartial or more competent jurors to decide it, or that more or clearer evidence will be produced on one side or the other. With this in view it is your duty to decide this case if you can without yielding your conscientious convictions. In conferring together you ought to pay proper attention to each other's opinions and listen with a disposition to be convinced by each other's arguments, and, on the other hand, if a larger number of your panel are for conviction a dissenting juror should consider whether a doubt in his own mind is a reasonable one which makes no impression on the minds of so many jurors equally honest, equally intelligent with himself, who have heard the same evidence, with the same oath; and if on the other hand, the majority are for the defendant the minority should ask themselves whether they may not and ought to reasonably doubt seriously the correctness of a judgment which is not concurred in by most of those with whom they are associated, and distrust the weight and sufficiency of that evidence which fails to carry conviction to the minds of their fellow jurors * * * and with that instruction you will continue your deliberations, Members of the Jury." Within 15 minutes after the giving of this instruction the jury notified the bailiff that they had reached a verdict, and on being brought into court returned verdicts of guilty on each count.

By sufficient assignments of error complaint is made that the court erred (1) in giving the instruction above quoted under the circumstance it was given; (2) in proceeding to trial in the criminal matter without first having disposed of the insanity proceedings instituted by the mother; (3) in refusing to permit defendant to interrogate the witness Georgia Smith with respect to her opinion as to whether defend-

ant was insane; (4) in refusing to instruct the jury to disregard Exhibit "E"; and (5) in imposing excessive sentences. The pertinent facts appertaining to these several assignments will be delineated at the time they are considered.

The merits of this appeal, if any, lie in a consideration and determination of the propriety of giving this instruction under the attendant circumstances. Defendant contends that by this instruction the court urged an agreement upon a verdict, was commenting on the evidence, and coerced the jury into arriving at a verdict, thus interfering with the exercise of free and unbiased judgment by those jurors comprising the minority. The propriety of giving this instruction under the circumstances existing at the time it was given or at all presents a question of first impression in this jurisdiction. At least the Arizona cases cited by counsel are of little help in solving the problem. In Pfeiffer v. State, 35 Ariz. 321, 278 P. 63, we held that certain remarks made by the trial court from which the jury might well infer that they would be held together until they reached a decision constituted prejudicial and reversible error, as being an indication by the judge of his opinion as to the guilt of the defendant. In the later case of Douglass v. State, 44 Ariz. 84, 33 P.2d 985, we held that the judge's statement to the jury during their deliberations that he would not be present until late the following day to receive a verdict, accompanied by a warning that he did not wish to coerce or influence the jury, was not prejudicial or erroneous.

There is definitely a split in authorities as to the propriety of giving an instruction similar to the one challenged in the instant case, and its use has been the subject of many conflicting judicial opinions. For an exhaustive treatise of this matter of Urging Agreement and Coercion of Jury, see the following texts: 53 Am.Jur., Trial, Secs. 950 to 964, incl.: 64 C.J., Trial, Sec. 641, 842, 843; 8 Cal.Jur., Criminal Law, Sec. 432, at page 394; and Bowers Judicial Discretion of Trial Courts, secs. 344, 371, and 376. The reported cases are collated in the excellent annotations appearing in Ann.Cas.1915D, 668; 85 A.L.R. 1420, 1436; and 109 A.L.R. 72, 85. Apparently its use originated in Massachusetts and Connecticut according to a statement appearing in Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 157, 41 L.Ed. 528, where the giving of such an instruction was held not to be prejudicial.

■ Instructions of the same import as the one here under consideration have been approved in courts of last resort all over the United States—North, South, East, and West. In some instances the instruction was given in the first instance; in others, after many hours of deliberation, and where hopeless disagreement has been announced. See note 85 A.L.R. 1436; 109 A.L.R. 85. It all simmers down to a matter of discretion resting in the trial court. Did the court in the giving of this instruction in-

vade the province of the jury? Does it contain any intimation of the verdict to be reached? Did it have any tendency to make any juror yield his conscientious convictions? Our considered answer to each of these interrogatories is "No." After having analyzed the instruction, as a whole and sentence by sentence, we are profoundly impressed with its value, fairness, and good sense. It counsels the jurors to exchange opinions and ideas, to review the facts and reasonable inferences to be drawn therefrom; to question the tenability of preconceived opinions, prejudices, and fetiches that are not actuating the majority, or if previously entertained have been submerged by the application of reason induced in part by proper regard and deference to the opinions of others.

The law is enforced not by the recalcitrant few, but only through unanimity which in an era of individualism is difficult of attainment in the course of any human endeavor, especially when the mind is repeatedly stimulated with admonitions by the court that the ultimate verdict must express the conscientious convictions of each individual juror. In our judgment this instruction is wholly wanting in the vicious attributes leveled at it. Those cases holding instructions of like import to be bludgeons of intimidation strike an unresponsive chord in the majority of this court. If it fathomed the consciences of injudicious jurors, it served its purpose. Mr. Justice Brown, speaking for the Supreme

Court of the United States in the Allen case, supra, so succinctly stated the duty of a juror under our system that we are impelled to quote his words:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

It is no wonder that so many courts have been impressed with the fairness of the instruction and the inherent value of its admonitions. With the decision in Commonwealth v. Tuey, 8 Cush. 1, 62 Mass. 1 (followed in the Allen case, supra) before it, the Supreme Court of Colorado in Sevilla v. People, 1918, 65 Colo. 437, 177 P. 135, 137, in studying this instruction given to the jury after twenty hours of deliberation, observed that the communication to the jury was not an in-

struction on the law or facts, but rather in the nature of advice, urging agreement if possible. In Bowen v. People, 87 Colo. 38, 284 P. 779, 780, the instruction was again under consideration, and there the court said: "There is nothing in the instruction that savors of coercion, * * *." In Boegel v. People, 95 Colo. 319, 35 P.2d 855, 856, the court pointed out that this instruction gave no intimation of the court's opinion as to the guilt or innocence of the defendant "but merely suggested that the jurors agree upon a verdict if they could do so conscientiously." In Lathrop v. Fargo-Moorhead St. R. Co., 23 N.D. 246, 136 N.W. 88, 90, equivalent language was analyzed and the court concluded it could have left no "impression upon any juror that he should surrender his conscientious convictions to secure an agreement."

■ We now address our attention to the assignment that the court erred in proceeding to trial in the criminal matter without first disposing of the insanity proceeding initiated November 16, 1948, by Frieda Voeckell, mother of defendant, under the provisions of Sec. 8-301 et seq., A.C.A.1939. It appears to be counsel's contention that if such a petition is filed *prior* to the filing of an information it then becomes mandatory upon the trial court to forthwith determine whether such party is sane or insane. It is urged that the rules of criminal procedure, Sec. 44-1701 et seq., A.C.A.1939, govern only as to insanity proceedings originating *after* the information has been filed. In this view we do not concur. The answer to the problem involves purely a matter of statutory construction. The usual insanity proceedings were left unchanged by our adoption of the new Rules of Criminal Procedure. But these rules did change the procedure for determining whether an accused should be put to trial when "before or during the trial the court has reasonable ground to believe that the defendant, against whom an indictment has been found or information filed, is insane, or mentally defective, to the extent that he is unable to understand the proceedings against him or to assist in his defense, * * *." Sec. 44-1701, supra. This determination is now made by this court. (Id.) The proceedings under the provisions of Art. 3, Chap. 8, Sec. 8-301, supra, furnish no greater protection to defendant than proceedings under Art. 17, Chap. 44, Sec. 44-1701 et seq. The refusal of the trial judge to proceed to a hearing on the original insanity petition filed by defendant's mother violated no legal right of defendant which he can interpose as a defense to this action.

■ The third assignment of error complains of the refusal of the court to permit defendant on redirect examination to solicit the opinion of the lay witness Georgia Smith as to insanity of defendant. This witness, who had been called by defendant, testified on direct examination that for a year or more defendant

and his mother had lived in her trailer court; that she had seen defendant on many occasions and had visited with the family; that defendant seemed to be ill and frail; that he was definitely peculiar, citing instances; that "he seemed to have a very inferiority complex"; that his eyes were "very piercing, sharp and weird looking"; and that "I think he is mentally a very young boy, always playing with games."

The cross examination in part is as follows:

"Q. Actually you don't *know* to state whether he is mentally stable or unstable? (Emphasis supplied.)

"A. I couldn't say."

Then on redirect examination counsel apparently with the thought of rehabilitating the witness asked this question:

"Q. On the basis of what you told the jury, do you have an opinion as to whether he is sane or insane?"

Objection was made on the ground that she had stated that she didn't know whether he was mentally stable or unstable. The objection was sustained upon the ground that the witness had already given her opinion, and that the inquiry was improper redirect examination. This court has ruled that:

"* * * In cases of this kind the testimony of a lay witness who has had the opportunity of observing the past conduct and history of a defendant is as admissible on the question of whether he was or was not legally insane at the time he committed the act in question as that of a medical witness, the weight to be given to the testimony being determined by the triers of fact. 23 C.J.S., Criminal Law, § 867, pages 78-80, and cases cited." State of Arizona v. Macias, 60 Ariz. 93, 131 P. 2d 810, 813.

The recitation of the factual situation demonstrates that the witness on direct examination was allowed to testify that she thought the defendant was "mentally a very young boy." She was also permitted to recite her observations and mentioned many acts of defendant that she considered peculiar. She not only related acts but was allowed to interpret them. Counsel failed to incorporate in the formal question eliciting her opinion the element of "legal insanity." In any event the stating of her opinion would have added little to her testimony. It might be said that the court was technically in error in refusing to permit counsel to rehabilitate the witness, but even this assumption would necessitate assuming that the question propounded was legally sufficient—which it was not. A proper question under the circumstances might have been worded as follows:

"On the basis of your acquaintanceship with the defendant and your observations of him, do you have any opinion as to whether the defendant was legally insane at the time it is alleged he committed the

acts in question—that is, do you have an opinion as to whether defendant, if he committed the acts in question, knew the nature and quality of those acts, and if he had such knowledge did he know that he was doing wrong? In other words, if the defendant did those acts did he know the difference between right and wrong as to those particular acts?"

We conclude that under the circumstances it was within the discretion of the trial court to deny the attempted rehabilitation of the witness, and that no prejudicial error was committed in this respect.

The fourth assignment of error goes to the refusal of the court to instruct the jury to disregard the contents of Exhibit "E" insofar as it had any tendency to impeach the witness Frieda Voeckell upon the ground that the statements therein contained were hearsay evidence sufficiently effective to impeach the credibility of Mrs. Voeckell. This Exhibit "E" was a letter from the superintendent of the Mendocino State Hospital at Talmage, California, referring to the case history of defendant and stating it to be the opinion of the writer that during defendant's residence at the hospital he was unstable emotionally and considerably below average intelligence, to the extent that he made very inadequate adjustment socially, educationally, occupationally, and psycho-sexually; that he was of the mental age of about 12 years; that he was blunted emotionally with no definite delusions or hallucinations, but with defective judgment and comprehension; and that he at all times remained dull and childish. It was stated in the letter that the diagnosis of the hospital staff was "Dementia Praecox, Simple Type"; that he was a menace to society; and that the hospital staff had objected to his release which had been accomplished by court order. The superintendent then incorporated in the letter excerpts from the hospital's clinical records relating to observations of the mother, Frieda Voeckell, and quotations of statements made by her. These statements related that the mother had sent several telegrams to the county authorities requesting release of her son. She was quoted as having said that these authorities were dope fiends and crooks; that they were passing dope in the act of shaking hands; and that she had employed agents to watch them. This letter was exhibited on cross-examination to one of the psychiatrists testifying in behalf of defendant, who admitted having seen the letter and that he had taken it into consideration in arriving at his opinion that defendant was, in respect to the acts committed by him, unable "to distinguish between right and wrong in any sense, medical, legal, common sense, or any kind of sense * * *." When the exhibit was offered in evidence counsel for defendant made no objection and now admits that it was legally admissible in that it established one of the fact bases that the doctor acted and relied upon, and that such statement for this purpose was not

objectionable on the ground that it was hearsay. After the exhibit was read to the jury counsel moved the court "to instruct the jury to disregard the contents of the letter insofar as it applies to the mother, who is not on trial here." The court denied the request upon the ground that it had not been objected to at the time of its offer and admission.

Counsel now contends that the letter was not evidence per se of the truth of its contents and was not offered for that purpose, and insists that, the exhibit having been read to the jury, the defendant was entitled to some instruction from the court as to the purpose for which it might be considered since the contents of the letter in effect impeached the mother by hearsay testimony, damaging the credibility of her testimony and prejudicing the rights of defendant.

■ The request for instructions limiting the effect to be given the letter and the purpose for its admission was belatedly made. Technically speaking, the court should have instructed the jury as to the purpose for which the letter was admitted, and that the statements therein contained relating to the mother were hearsay evidence, and should not be considered by them in their consideration of the credibility to be given to her testimony. The request for the instruction was not couched in words reasonably calculated to suggest to the court the propriety of giving an instruction for the reasons now assigned.

The request was that the court "instruct the jury to disregard the contents of the letter insofar as it applies to the mother, who is not on trial here." Counsel made no attempt to elucidate what was in his mind and even now on reflection we would not have been able to discern the implications attributed to the request had they not been explained to us. In view of the incoherent testimony of Mrs. Voeckell, which demonstrated many idiosyncracies, it is doubtful that if the hearsay statements attributed to her had been directly testified to their effect would have been evaluated other than as cumulative. The failure to give the explanatory instruction was without prejudice.

■ The assignment asserting that the sentences imposed were excessive and not justified under the circumstances is wholly without merit.

■ Upon the whole record before us it does not appear that the court would have been subject to criticism if it had, prior to the conclusion of the trial, reconsidered its order putting the defendant to trial made at the end of the preliminary investigation as to defendant's insanity. Not having had the opportunity to observe the defendant and witnesses and appraise their testimony when given we are in no position to say that the court abused its discretion in this respect. Nor can we say as a matter of law that the jury was not justified in finding defendant sane within the legal meaning of the term, so

as to be responsible for the consequences of his acts.

The judgment is affirmed.

STANFORD, PHELPS and DE CONCINI, JJ., concur.

UDALL, Justice.

I dissent for it is my view that the giving of the challenged instruction (set forth haec verba in the majority opinion) under the attendant circumstances constituted prejudicial error entitling the defendant to a reversal of the judgment of conviction.

Appellate courts in the nation have sharply divided as to the propriety of giving instructions similar to the one in question. 53 Am.Jur., Trial, Sec. 956. Inasmuch, however, as it is a matter of first impression in this jurisdiction I strongly feel that the court, at this crossroad, has taken the wrong path, and that the approval of its use now and in the future is a step backward rather than forward in the fair and impartial administration of justice. It is for this reason, and this reason alone, that I dissent.

The principal citations relied upon in the majority opinion for countenancing the use of this instruction are federal cases and those from the State of Colorado. It must be remembered that federal courts have more freedom and latitude in handling juries than do most state courts; e.g., by statute federal judges are permitted to comment upon the evidence, whereas art. 6, § 12, Constitution of Arizona, expressly forbids trial judges in Arizona from so doing. The writer's impression gained from a reading of the Colorado cases is that the Supreme Court of that state feels bound by precedent to sustain its use though they frankly concede that it is commonly referred to in their jurisdiction as "the third degree instruction." Furthermore the soundness of giving this type of instruction has repeatedly arisen in that jurisdiction. Like Banquo's ghost it will not remain at rest. See Olguin v. People, 115 Colo. 147, 170 P.2d 285, and cases therein cited. It is also interesting to note that even the Colorado court has held that the giving of such instruction has its limits. I quote from the case of Peterson v. Rawalt, 95 Colo. 368, 36 P.2d 465, 467:

"Ordinarily a trial judge is within his rightful province when he urges agreement upon a jury at loggerheads with itself; but this process has its limits. Where, as in the present case, the jurors are evenly divided, three and three, it is a specially delicate matter to importune unanimity *when there is no indication of confusion or misapprehension in the minds of the jurors on the law of the case.*" (Emphasis supplied.)

Apparently there was no confusion existing in the minds of the jurors as to the law of the instant case as during their fifty-two hours of deliberation there had been no request to the court for further enlightenment thereon.

Most courts countenancing the giving of this instruction (now sanctioned by the

majority of this court) tolerate it rather than commend it, and many admit it would be better for the court, under most circumstances, to omit it. State v. Moon, 20 Idaho 202, 117 P. 757, Ann.Cas. 1913A, 724. In the interest of brevity, as it would serve no useful purpose, I shall refrain from collating and analyzing the many decisions from courts disapproving its use, being content to rest my dissenting views principally upon the sound logic of the Supreme Court of Iowa in State v. Peirce, 178 Iowa 417, 159 N.W. 1050, 1054:

" * * * there is no decision that such an instruction should never be given, and no more is held than that it depends upon the conditions under which its language is used whether there is reversible error. *. * *

"We have intimated strongly that such instructions are erroneous if: (1) Their language indicates an intention to coerce into agreement; or (2) suggests the jury would be kept together until it agreed. (Citing cases.) The ultimate test would seem to be whether the additional instruction forced or helped to force an agreement, or whether it merely started a new train of real deliberation which ended the disagreement. * * *

* * * * * *

"The Clemens Case [(Clemens v. Chicago, R. I. & P. R. Co.), 163 Iowa 499, 144 N.W. 354] emphasizes that the physical discomfort of long confinement to men accustomed to outdoor living creates a dangerous atmosphere in which to receive an instruction urging the yielding of the minority and the desirability of verdicts, and that, where this is done, it 'leads the mind to the more reasonable suspicion that they ceased further resistance, gave up their own convictions, and surrendered to the majority than that they proceeded thereafter to the laborious and uncertain task of convincing themselves that they were wrong,' and that 'such instructions have been sustained largely upon the ground that, under the peculiar circumstances of each case, no prejudice could be presumed to have arisen to the complaining party,' and the tendency of it is to be a 'tentative suggestion of longer confinement in the event they failed to agree.'

"The only practical general rule that may be worked out from all this is that, where the disagreement is of more than ordinary and usual duration, and after the giving of such an instruction as this a verdict is reached in a time short in comparison with the duration of the disagreement, a presumption arises that the instruction was prejudicial; * * *."

The jurors in the instant case, which had taken but three days to try, were at loggerheads; the judge knew that fact and was determined to break the deadlock. With the scales thus delicately balanced the court upon its own motion gave the instruction in question which certainly accomplished the purpose intended, for within fifteen minutes thereafter they announced agreement. To my mind that con-

stituted coercion and was an abuse of discretion which can not be explained away by any high sounding words as to the fairness or innocuousness of the instruction. The old adage that "proof of the pudding is in the eating" applies.

I agree with defense counsel that after hearing this instruction each minority juror no doubt reasoned thusly to himself:

"The majority think he is guilty; the Court thinks I ought to agree with the majority so the Court must think he is guilty. While the Court did tell me not to surrender my conscientious convictions, he told me to doubt *seriously* the correctness of my own judgment. The Court was talking directly to me, since I am the one who is keeping everyone from going home. So I will just have to change my vote."

The time element alone negatives any contention that the instruction "started a new train of real deliberation which ended the disagreement." The authorities hold the fact of a speedy agreement after a prolonged previous disagreement gives rise to an inference that the instruction had a coercive effect. Middle States Utilities Co. v. Incorporated Telephone Co., 222 Iowa 1275, 271 N.W. 180, 109 A.L.R. 66; McCarthy v. Odell, 202 App.Div. 784, 195 N.Y.S. 80.

An examination of reported decisions where the giving of instructions similar to that given in the instant case was under consideration and held to be not coercive almost invariably discloses a comment by the appellate court to the effect that the evidence of the defendant's guilt was so overwhelming as to leave little room for reasonable doubt. See Boehm v. United States, 8 Cir., 123 F.2d 791, 812. Such certainly was not the situation in the case at bar as the great preponderance of medical and documentary evidence tended to establish defendant's plea of insanity. There was a conflict in the evidence in that the two doctors who assisted in making the preliminary examination, at the trial proper adhered to their previous conclusion that the defendant was sane, while opposed to this we have evidence of the inherited insanity tendency, the documentary proof of prior commitments in California, and the testimony of the following noted psychiatrists—Drs. Lindsay E. Beaton, Charles N. Sarlin, and Phillip S. Greenbaum, staff neuro-psychiatrist of the United States Veterans Hospital at Tucson, who testified that, in their opinion, defendant was suffering from schizophrenia (dementia praecox) with paranoid trend, and that at the time of the assaults he was also subject to psychomotor epilepsy.

Under this state of the record I do not believe that it can be reasonably maintained that the court was justified in giving this supplemental instruction for the reason stated in the majority opinion, " * * * If it fathomed the consciences of injudicious jurors, it served its purpose. * * * " As I view the situation, the court was not dealing with a minority composed of "injudicious," perverse or stubborn jurors.

Apparently the majority of the court also share in part this view, else they would not have concluded their opinion with this significant statement:

"Upon the whole record before us it does not appear that the (trial) court would have been subject to criticism if it had, prior to the conclusion of the trial, reconsidered its order putting the defendant to trial made at the end of the preliminary investigation as to defendant's insanity."

It is my candid opinion that the state has no occasion to feel proud of this conviction. Unquestionably the defendant is a menace to society and for society's protection he should be permanently restrained of his liberty. However, the route pursued in obtaining this desired objective offends my sense of justice. I surmise that in the past, with trumped-up insanity defenses, the officers had heard the cry of "wolf, wolf" so often that they failed to recognize the real thing when it came along.

It cannot be stressed too strongly that in determining whether a jury has been coerced into returning a verdict all of the attendant circumstances must be considered as well as the particular language used in the instruction complained of. See People v. Pizzino, 313 Mich. 97, 20 N.W.2d 824. In the instant case the following are some of the factors that must needs be considered in weighing the effect upon the jury of the court's giving of this additional instruction: the unprovoked and decidedly vicious attack by defendant upon a prominent young man and his wife; the wide publicity given the matter which naturally tended to stir the emotions of the citizenry resulting in the explosive situation with which the court was dealing; defendant's failure to deny the commission of the physical acts constituting the attacks; his resort to the sole defense of insanity to show lack of criminal intent—this being a plea too frequently resorted to by those having no real defense; the lateness of the hour when the instruction was given and the strong probability that if they did not immediately agree upon a verdict they would be required to spend a third night confined to their quarters.

There is very respectable authority for the proposition that the language of a trial court in charging a jury as to the effort to be made to agree upon a verdict, which might be innocent if uttered before submission of a case to a jury, can well be regarded as harmful if applied to a specific disagreement. Nick v. United States, 8 Cir., 122 F.2d 660, 138 A.L.R. 791.

While I recognize that a trial court has wide discretionary power in the handling of juries, yet there should be nothing in the intercourse of the trial judge with the jury having the least appearance of duress or coercion. Meadows v. State, 182 Ala. 51, 62 So. 737, Ann.Cas.1915D, 663, 664. In my opinion the giving of the instruction complained of unfairly tipped the scales of justice against this defendant as it had a highly coercive effect upon the jury. Fur-

thermore I am convinced that if this instruction under similar circumstances comes into general use in the trial courts of this state it will more frequently than not result in miscarriages of justice.

The courts are ever alert to curb "third degree" methods by peace officers against those accused of crime, hence it becomes all the more necessary that the trial court itself refrain from any act, such as the giving of last minute "advice" that in Colorado at least has earned the sobriquet of "third degree instruction." The Supreme Court of Michigan in speaking of acts of jury coercion made this sage statement: "Every attempt to drive men into an agreement which they would not have reached freely is a perversion of justice." Pierce v. Pierce, 38 Mich. 412.