STATE, Respondent, *v.* SHANNON, Appellant.

(No. 7,145.)

(Submitted October 2, 1933.    Decided October 31, 1933.)

[26 Pac. (2d) 360.]

281

*Mr. Hugh R. Adair* and *Mr. Lester H. Loble,* for Appellant, submitted a brief; *Mr. Adair* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Enor K. Matson,* Assistant Attorney General, for the State, submitted a brief; *Mr. Matson* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

The county attorney of Lewis and Clark county filed an information charging Dodge Shannon, George Fuller (sometimes called Clark), Ray E. Brewer and James Tatum with unlawful possession of apparatus, paper and other things made use of

in counterfeiting. Shannon was tried separately, convicted and sentenced to the state prison. This appeal is from the judgment of conviction and the order denying a new trial.

Thirty-eight assignments of error are urged. The assignments were grouped into four groups for discussion; it is not necessary to discuss all of them in detail. The more important groups will be given consideration.

The essential facts, briefly stated, are as follows: The four defendants were gamblers and in the month of December, 1932, were residing in Helena. Shannon and Fuller (Clark) were occupying a room at the Park Hotel, and the other two defendants had a room at the Mitchell Block. Apparently, however, the rooms were used more or less interchangeably by the four defendants. Harry L. Hale, a resident of Helena, was the chief witness for the state. He testified that the defendant Fuller, known to him as Clark, induced him to go to one of the rooms occupied by the defendants in the Mitchell Block, and that in his presence and in the presence of Fuller, or Clark, Shannon proceeded "to show what he had to offer." Briefly, he claimed that Shannon opened up a black grip from which he took a couple of boards, some pans, and a lot of little vials with fluids, powders, some glass cylinders, rubber gloves and an assortment of chemicals. Shannon asked for a bank note, and Clark reached in his pocket and produced two or three bank notes or bills. The bill given to Shannon was a $20 bill. Shannon took the bill and by use of a little sponge covered one side of it with some kind of acid or solution, and then turned it over and saturated the other side. He placed two pieces of clean white paper about the size of the $20 bill against the two sides thereof, rolled the paper around a glass cylinder, rolled the cylinder with the papers back and forth on a flat board for a short time, took the papers off the cylinder, removed them from the bill, washed the bill off, and laid it on the edge of the bed to dry. Shannon then showed Hale the two pieces of paper and explained that he had transferred the reading matter, figures, etc., from the $20 bill to the white paper; the printing matter, etc., on the white paper so transferred, showed in

the reverse. Shannon explained that the process had to be carried out further by the use of a $1 bill from which the printing and all coloring matter was removed. That in order to complete the conversion, the bleached paper of a $1 bill was placed between the two sheets of paper then bearing the printing and other matter from the $20 bill in reverse, and the rolling process repeated, and that when completed the $1 bill would then bear the similitude of the $20 bill. He explained the bleaching process to which the $1 bill was subjected. He also produced and exhibited to Hale what he said were serial numbers of bills, and explained how he placed those serial numbers on the converted bills so as to give the remade bills the genuine appearance of $20 bills. The explanation was elaborate and, while the process was not entirely demonstrated, the entire operation, according to Hale, was either demonstrated or explained to him. It was further explained that such $20 bills, when completed, would have the appearance of genuine bills. Shannon said he could make $20 bills by that procedure; he said, "I can make new bills this way."

The part that Hale was to play, according to his testimony, was outlined by the other men, and was to consist of introducing the men to Helena citizens, or making them acquainted with some of the local residents. Hale claimed that he never entered into the transaction further than to listen to the explanations and to watch Shannon make the experiments as indicated; he did, however, detail the facts of the visits to certain officers, including the sheriff and a federal prohibition official. Later the officers proceeded to the rooms of the defendants, arrested them and took away the paraphernalia described.

The defendants attempted to explain away the possession of the paraphernalia. They asserted that the various exhibits introduced by the state, together with others introduced by themselves, constituted equipment used by them in their gambling operations and in marking cards, changing dice and otherwise altering gambling paraphernalia, so that they could the better and more certainly win money in gambling games.

The defendants also denied that the exhibited articles could be used for counterfeiting.

The information is drawn under the provisions of section 11365 of the Revised Codes of 1921, the material part of which reads as follows: "Every person who makes or knowingly has in his possession any die, plate, or any apparatus, paper, metal, machine, or other thing whatever made use of in counterfeiting coin current in this state, in counterfeiting gold-dust, gold or silver bars, bullion, lumps, pieces, or nuggets, or in counterfeiting bank-notes or bills, is punishable by imprisonment," etc.

The charging part of the information reads as follows: "That at the county of Lewis and Clark, in the State of Montana, on or about the 16th day of December, A. D. 1932, and before the filing of this information, the said defendants did wilfully, unlawfully and feloniously, knowingly have in their possession apparatus, paper and other things made use of in counterfeiting bank notes or bills, contrary to the form, force and effect of the statute in such case made and provided and against the peace and dignity of the State of Montana."

Specifications of error 1 to 6, inclusive, constitute an attack upon the sufficiency of the information. Proper and timely objections were made to the form of the information at every stage of the case. Demurrer was urged before the arraignment, and objections and motions were interposed to the end of the proceeding. These objections urged that the information was insufficient by reason of the fact that the words of the statute were literally or substantially followed, and that no sufficient description of the offense was set out; in other words, that the charging part of the information did not specifically describe the ".apparatus, paper and other things," but merely employed the words of the statute.

It must be observed that the prosecution is not for counterfeiting, or for the use of the apparatus, etc., in counterfeiting, but is based upon the possession of articles "made use of in counterfeiting"—a distinct crime. The section under which the prosecution proceeded necessarily involves elements and con-

siderations different from those common to a charge of counterfeiting.

The defendant contends that he was entitled to be advised as to what particular articles he unlawfully possessed, to the end that he might properly prepare his defense. Courts generally hold that an information is sufficient when it literally or substantially follows the language of the statute. (15 C. J. 367.) The modern tendency of criminal procedure has been distinctly towards simplification. Informations charging murder were formerly lengthy and verbose; finally, this court in *State* v. *McGowan*, 36 Mont. 422, 93 Pac. 552, and *State* v. *Hayes*, 38 Mont. 219, 99 Pac. 434, recognized the simpler and more liberal rule, a rule which it, after twenty years of experience declared wise and salutary. (*State* v. *Gondeiro*, 82 Mont. 530, 268 Pac. 507, 511.)

The cases relied upon by defendant are mostly of early origin, although it is interesting to note that as early as 1841 the Tennessee court broke away from the strict rule and sustained an indictment which was subject to the objections lodged against the information in this case. (*Bradford* v. *State*, 3 Humph. (22 Tenn.) 370.)

The information here, although not a model, was sufficient. If it was too general in character to advise the defendant as to what he had to meet, he had a plain remedy available. He could have called for a bill of particulars. This court has specifically recognized the right to call for such a bill. In *State* v. *Gondeiro*, supra, it, speaking through the Chief Justice, said: "When it is apparent to the court that the defendant, by reason of the general character of the charge, may have difficulty in preparing his defense, we think the trial judge should incline toward granting a motion for a bill of particulars; we commend the practice." (See, also, *State* v. *Sedlacek*, 74 Mont. 201, 239 Pac. 1002.)

Defendant asserts error in the admission of certain testimony given by the state's witness Bechtel, a federal employee engaged in investigating counterfeiting cases. The state used Bechtel as an expert witness in an endeavor to explain to the jury that

the exhibits might or could be used in counterfeiting. Bechtel was properly qualified as an expert witness to the satisfaction of the court, in accordance with the declaration of this court in *State* v. *Harkins,* 85 Mont. 585, 281 Pac. 551.

Objection was made that the witness Bechtel was permitted to answer questions propounded by the county attorney in the abstract form, rather than being given a set of hypothetical facts upon which to base his opinion as an expert. It is obvious that the matter in controversy was a proper subject for expert testimony. In the case of *Copenhaver* v. *Northern Pacific Ry. Co.,* 42 Mont. 453, 113 Pac. 467, the court adopted the rule that whenever the conclusion to .be drawn from the facts stated depends upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence, the conclusion may be stated by a qualified expert, even though the conclusion is a statement of an ultimate fact to be found by the jury. This view was adopted in the later case of *Kelley* v. *John R. Daily Co.,* 56 Mont. 63, 181 Pac. 326. (See, also, *In re Miller's Estate,* 71 Mont. 330, 229 Pac. 851. Compare *State* v. *Collins,* 88 Mont. 514, 294 Pac. 957, 73 A. L. R. 861.)

The witness was handed some of the various articles (which had been admitted in evidence) mentioned above, and was asked ''whether they might or could be used in counterfeiting.'' Obviously, the desired information could not have been satisfactorily obtained from this expert witness in any other way. The defendant suggests that Bechtel's testimony on this point should have been in the form of answers to hypothetical questions. It would seem, however, that the very nature of the information sought here would make the use of hypothetical questions highly impractical. ''Expert witnesses shown to be qualified may give their opinions or conclusions from facts observed by them, or within their knowledge and testified to by themselves, and supported either by facts or testimony of other witnesses already given or to be given, or on facts derived partly from one source and partly from another, and it is not always necessary that the facts be stated in a hypothetical

question." (Underhill's Criminal Evidence, p. 264.) It was not error to allow the witness to so testify. (See, also, on this point, *Commonwealth* v. *Russ,* 232 Mass. 58, 122 N. E. 176.)

Defendant alleges error in a hypothetical question propounded to and answered by Bechtel. The objection based on the ground that the question was without proper foundation in the evidence was well taken. The question should have been framed in accordance with the evidence in the case; however, the deviation from the evidence was not great, nor very important.

The defendant testified in his own behalf. On direct examination he merely denied the testimony of the witness Hale, and declared that he did not have the exhibits in his possession for the purposes charged; that he did not at any time make any counterfeit bills or notes or use the exhibits for any such purpose; that he did not make the demonstration to Hale or in his presence; and that he only used the exhibits for the purpose of marking cards and dice and making "flash rolls." On cross-examination he was asked if he had ever been convicted of a felony. He answered in the negative. He was then asked if he had ever "plead" guilty of a felony. Objection was made, and the question was withdrawn. The county attorney then asked the following question: "Didn't you pass some counterfeit money in Billings?" The record shows that the witness answered, "No, sir," but the attorney for the defendants made the following objection, "to which we object as not being proper cross-examination." At this point a controversy arose between counsel, but apparently no ruling was made by the court. The county attorney then asked the defendant why he had left Billings, and defendant answered, "I left there for the reason only it is quiet around there and I could not make a living. That is the only reason I left Billings." The county attorney thereupon asked this question: "Just once more I will ask you if or not there is any other reason than that Billings was quiet?" Defendant's counsel objected to the question, asserting that it was incompetent, irrelevant, and immaterial, and not proper cross-examination.

The objection was overruled, and the witness repeated his previous answer.

The obvious purpose of the county attorney in asking the questions could only have been to show that the defendant had been guilty of other similar offenses. The question relative to passing counterfeit money at Billings suggested another criminal act, one punishable under a different statute. This court has often recognized the right of the state to make proof of other offenses for the purpose indicated. (*State* v. *Hall,* 45 Mont. 498, 125 Pac. 639, and other later cases.) If the state desired to make proof of such other offenses for the purpose of showing a general scheme or intent, it was incumbent that the rules of evidence and orderly procedure be observed. Such charges could not be established by cross-examination of the ▇ defendant. Under the pretense of cross-examination of a witness one party to an action cannot make out his case by witnesses for the other side. A comprehensive discussion of this rule is contained in the opinion in the case of *State* v. *Smith,* 57 Mont. 349, 188 Pac. 644.

It is urged by the state that the above error was not substantial and that under the command of section 12125 of our Codes this court must disregard technical errors or defects which do not go to the substantial rights of the parties. What, then, is a substantial right? Manifestly a right declared by statute must be considered substantial. Section 10668, Revised Codes 1921, provides that a witness may not be impeached by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or by the record of the judgment, that he has been convicted of a felony. In *State* v. *Kanakaris,* 54 Mont. 180, 169 Pac. 42, 44, and *State* v. *Smith,* 57 Mont. 349, 188 Pac. 644, this court reversed convictions because of the asking of questions similar to those propounded to the defendant here. There the court said: "The attorney could have had no other object in view than to impeach the defendant or degrade him in the estimation of the jury, and for either purpose the questions are forbidden by statute," citing *State* v. *Rogers,* 31 Mont. 1, 77 Pac. 293. The

rule was announced by this court many years ago. (*State* v. *Gleim*, 17 Mont. 17, 41 Pac. 998, 52 Am. St. Rep. 655, 31 L. R. A. 294.) In *State* v. *Rogers*, supra, the court specifically adhered to the rule, and approved the leading California case on the subject with the remark that it was unnecessary to repeat the discussion. (See *People* v. *Wells*, 100 Cal. 459, 34 Pac. 1078, 1079.)

The record is not very clear as to the objections urged at this point. Apparently the witness answered the first objectionable question as to passing counterfeit money at Billings, before the objection was made. It will be observed, however, that this question was then immediately followed up by the repeated question why the defendant left Billings. We find ourselves in agreement with the Oklahoma case of *Watson* v. *State*, 7 Okl. Cr. 590, 124 Pac. 1101, 1104, in this matter, wherein it was said: "The harm was in the asking of the question." The courts pretty generally recognize that principle. Our own court has twice quoted with approval the rule laid down in *People* v. *Mullings*, 83 Cal. 138, 23 Pac. 229, 231, 17 Am. St. Rep. 223, wherein the court said: "It is quite evident that the questions and not the answers were what the prosecution thought important. The purpose of the questions clearly was to keep persistently before the jury the assumption of damaging facts which could not be proven, and thus impress upon their minds the probability of the existence of the assumed facts upon which the questions were based." (*State* v. *Rogers*, supra; *State* v. *Jones*, 48 Mont. 505, 139 Pac. 441.)

It is interesting to observe that the prosecution did not make any attempt to prove the other criminal acts. A timely attempt to show such other acts would have disclosed a degree of good faith at least, and would have evidenced a purpose to present the matter in accordance with recognized rules of evidence.

The negative answers to the questions did not cure the ▇▇ matter. It has been held that failure to restrict a cross-examination to the subject of the direct examination is re-

versible error, and that the error is not cured by a negative answer. (*State* v. *Smith,* supra; 17 C. J., p. 316, and cases cited.)

There can be no question that the asking of the questions was error. But was it prejudicial error? We think it was. The supreme court of California, in the case of *People* v. *Wells,* supra, said: "The only question, then, is whether or not we can see from the record that the conduct of the prosecuting attorney did not prejudice the appellant; and we certainly cannot see that it did not." The procedure was in violation of the statute, as suggested in the cases of *State* v. *Kanakaris,* and *State* v. *Smith,* supra, and constitutes ground for reversal.

For the foregoing reasons the judgment is reversed and a new trial ordered.

The other specifications of error have been examined, but we do not deem it necessary to discuss them, as they are either without merit or are not likely to arise in a retrial of the case.

Reversed and remanded.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS and ANDERSON concur.

MR. JUSTICE ANGSTMAN: I dissent. In my opinion the cross-examination of defendant relative to passing counterfeit money in Billings does not necessitate the granting of a new trial. Defendant was charged with having in his possession "apparatus, paper and other things made use of in counterfeiting bank notes or bills." A vital issue in the case was whether the apparatus, paper and other things were capable of being used in counterfeiting.

Defendant on his direct examination testified: "I have heard the testimony of the state's witnesses. All of this paraphernalia was used in connection with gambling operations or the marking of cards and dice or the making of flash rolls; that is the purpose for which they were used by me and Mr. Fuller; I did not make use of them for any other purpose. I did not at any time make use of any of these exhibits for the purpose of

making any imitation or similitude of counterfeit bills or notes or the similitude or imitation of a genuine bill or note. I never used it for the purpose of making any imitation or similitude of any bank note or bill. I did not have it for any other purpose than has been related by the witness George Fuller; that was in connection with my operations as a gambler.''

Defendant stated that Fuller correctly explained the use of the apparatus. Fuller explained that the apparatus was used for marking cards and dice for gambling purposes. He explained their methods of operation, as follows: ''You ask if the four of us fellows were involved in this scheme to bunco somebody; not to bunco, to win the bankroll out there. You ask what I call that, just simple larceny; no, it isn't larceny, if you get a man out there and the taking is fast and nobody can beat him, it is just—just kind of a professional proposition and absolutely all right. The four of us were going to carry out this professional scheme of ours.''

Thus defendant was permitted to show that the apparatus was used to commit a catalogue of crimes relating to gambling, but not for the purpose of counterfeiting. The gist of his evidence was that, while he was guilty of violating the anti-gambling laws, he was not guilty of the particular crime charged. If defendant had actually passed counterfeit money in Billings, the jury might well have presumed that the apparatus was used in making it. While the passing of counterfeit money is a different crime from that of possessing apparatus for use in counterfeiting, yet the two are so related that the proof of one tends to prove the other, and is admissible to show the criminal intent. (*People* v. *White*, 34 Cal. 183; *York* v. *United States*, (C. C. A.) 241 Fed. 656.)

It is true that one party cannot, over objection, make out his case on the cross-examination of a witness for his adversary, if the cross-examination goes to matter not brought out on direct examination. But if no objection is made, this very thing can be done, in which case the witness becomes a witness for the examining party as to the new matter. (*State* v.

*Richardson,* 63 Mont. 322, 207 Pac. 124.)   But here the state did not make out its case on the cross-examination of defendant. Defendant's answer was detrimental to the state.   The question here is: Was the mere asking of the question prejudicial to defendant?

Under our statute, a witness may be compelled to answer a question which will have a direct tendency to degrade his character, if the answer goes to the fact in issue or to a fact from which the fact in issue would be presumed.   (Sec. 10674, Rev. Codes 1921.)   And if the question is pertinent, the fact that it may tend to prejudice the witness before the jury is no ground for its exclusion, much less for a new trial.   (*Lukert* v. *Eldridge,* 49 Mont. 46, 139 Pac. 999.)   The test usually applied is: Was the question asked in good faith and not for the sole purpose of degrading the witness?   (*People* v. *Burns,* 121 Cal. 529, 53 Pac. 1096; *State* v. *Greenland,* 125 Iowa, 141, 100 N. W. 341; *Russell* v. *State,* 24 Ala. App. 496, 137 So. 460.)

I think we are not justified in saying that the questions complained of were not asked in good faith.   Moreover, the answer of the defendant, being favorable to him, I fail to see how, in the light of his own admission of being a professional swindler, prejudice could have resulted.   (Compare *Lukert* v. *Eldridge,* supra.)   If we are to assume that the jurors disregarded their sworn duty and found defendant guilty of a crime other than the one charged in the information, is it not more reasonable to suppose that they considered the gambling with marked cards and dice, which defendant freely admitted on his direct examination, rather than the passing of counterfeit money, which he positively denied?

I think the error, if such it be, for which the judgment is reversed, was technical, does not affect any of the substantial rights of the defendant, and should be disregarded under the command of section 12125, Revised Codes of 1921, as was done by the learned trial judge in denying the motion for a new trial.

Rehearing denied November 18, 1933.