THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, v. ROBERT HALEY, DEFENDANT AND APPELLANT.

No. 9725.

Submitted June 4, 1957. Decided December 2, 1957.

318 Pac. (2d) 1084.

Mr. G. J. Jeffries, Roundup, for appellant.

Mr. Forrest H. Anderson, Atty. Gen., Mr. William F. Crowley, Asst. Atty. Gen., Mr. Larry O. Foss, County Atty., Harlowton.

Mr. Jeffries and Mr. Crowley argued orally.

MR. JUSTICE ADAIR:

Teenage Vicki DeBotts was instantly killed in an automobile smashup in Harlowton, Montana. Robert Haley, the driver of the death car, was informed against, tried by a jury and convicted of the crime of manslaughter for such killing. From the judgment of conviction entered against him on the jury's verdict and from the order denying him a new trial the defendant Haley has appealed assigning fourteen specifications of error.

Defendant first specifies as error the disallowance of his motion to dismiss the proceedings and the overruling of his objection to the admission of any testimony both made at the outset of the trial, wherein he claimed that the information is insufficient to charge the commission of a public offense.

The information charged that the defendant Robert Haley "on the 16th day of September, 1956, at the County of Wheatland, State of Montana, committed the crime of manslaughter committed as follows: to-wit: That he, the said Robert Haley, did then and there, knowingly, wilfully and feloniously kill one * * * Vicki DeBotts, a human being, which act was pro-

hibited by law, and contrary to the form, force and effect of the statute in such case made and provided and against the peace and dignity of the State of Montana.''

The information is in the form prescribed in R.C.M. 1947, ▮ Sec. 94-6404. It complies with the requirements of R.C.M. 1947, 94-6403 and Sec. 94-6405. It meets the tests provided in R.C.M. 1947, Sec. 94-6412. It is sufficient. State v. Duncan, 130 Mont. 562, 305 Pac. (2d) 761; State v. Souhrada, 122 Mont. 377, 380, 204 Pac. (2d) 792; State v. Heaston, 109 Mont. 303, 307, 97 Pac. (2d) 330; State v. Shannon, 95 Mont. 280, 285, 26 Pac. (2d) 360; State ex rel. Borberg v. District Court, 125 Mont. 481, 490, 240 Pac. (2d) 854; State v. Gondeiro, 82 Mont. 530, 268 Pac. 507. There is no merit in defendant's specification of error No. 1.

Next defendant contends that the evidence submitted is insufficient to warrant conviction and that the trial court erred in denying his motion to dismiss the proceedings made after the close of the state's case. The evidence herein shows:

The defendant Robert Haley and his wife resided at Martinsdale, Montana at the times hereinafter mentioned. At about 7:30 or 8 o'clock on the evening of September 15, 1955, Haley accompanied by two Cameron brothers, George, aged 17 years, and Gilbert, aged 20, left the Cameron ranch located about three miles northwest of Martinsdale, and drove to Two Dot, Montana, where Haley stopped his automobile, a four door 1947 model, Pontiac, and entered a bar to get something to drink. The Cameron brothers did not enter the bar but remained in Haley's car.

After an absence estimated by him at ''maybe fifteen, twenty minutes'' Haley came out of the bar carrying two six packs of beer which he placed in the Pontiac. He then proceeded to drive toward Harlowton, Montana. While so enroute the occupants of the car were engaged in drinking of the beer just purchased and each consumed at least two cans of beer on the way.

At about 8:30 o'clock that evening Haley and his two companions arrived in Harlowton. There they proceeded to drive

about the city for a while during which time the three continued their beer drinking in the car. Finally Gilbert left the car and entered the Corner Cafe to have coffee with the understanding that he would again be picked up in fifteen or twenty minutes.

Haley and George Cameron continued to cruise about the streets of Harlowton until about 9:30 o'clock in the evening when George observed on the street near the movie theatre, Vicki DeBotts, a teenage girl, with whom he had been keeping company, whereupon Haley stopped his car near the theatre. George stepped out and he and Vicki DeBotts entered the theatre where they remained for approximately five minutes.

In the meantime Helen Burbee, aged sixteen years, who was cashier and ticket seller at the theatre, had completed her shift of work and was leaving the theatre, when, at Haley's invitation, she entered defendant's parked car and was sitting in the front seat with Haley when George Cameron and Vicki DeBotts emerged from the theatre and entered the automobile where they occupied the rear seat.

Helen Burbee testified that as she entered Haley's car she "knew he had been drinking, but he wasn't drinking much."

Haley then drove to the Corner Cafe where, at about 10 o'clock p.m., he picked up Gilbert Cameron who climbed in the rear seat with his brother, George and Vicki DeBotts. The five then rode about the city for awhile and finally parked down in the river bottoms near the Milwaukee railroad tracks where they remained for about an hour during which time more beer drinking took place in the car.

Helen Burbee testified that so far as she could remember the only members of the party whom she saw drinking while the car was so parked near the railroad tracks were the defendant Haley and George Cameron. However, Haley testified that while there parked he and the two Cameron brothers consumed one can of beer each.

Gilbert Cameron testified that the drinking that night was not limited solely to the twelve cans of beer purchased by Haley

at Two Dot but that upon leaving the place where they were parked near the railroad tracks Haley again drove up town to the Lounge Tavern in Harlowton where he purchased more beer. Gilbert Cameron testified: "I think it was a six pack— I wouldn't—that's what I saw." Haley disputed this statement and testified that only two additional cans of beer were obtained at the Lounge.

Upon leaving the Lounge Tavern Haley drove about three miles westerly and northerly from Harlowton on State Highway No. 6 to the Nick Muir ranch where he turned off the highway, crossed a cattle guard and entered Muir's pasture, where at about 11:15 or 11:30 p.m. the five parked for another hour or so during which time there was more beer drinking in the car.

As to the quantity of beer there consumed and as to who did the drinking the testimony is again in conflict. Haley testified that while parked at the Muir ranch he drank one can of beer and that he believed the Cameron brothers drank one can each. Gilbert Cameron denied that he drank anything while there parked. When asked whether any beer drinking was done at the Muir place Helen Burbee testified: "I wouldn't say for sure; I think there was." When asked if there was any drinking in the car as it was proceeding along the highway on the return trip from the Muir ranch to Harlowton she said: "I don't remember."

On the return trip to Harlowton from the Muir ranch Haley was behind the wheel driving. He and Helen Burbee sitting on his right, occupied the front seat while the Cameron brothers and Vicki DeBotts occupied the rear seat with Vicki sitting at the extreme right, George Cameron in the middle and Gilbert Cameron at the extreme left.

From the Muir ranch Haley drove his car southerly and easterly on Highway No. 6. At the city limits there was a road sign marking such city limits and giving notice of the speed limit of 25 miles per hour within the city.

Helen Burbee testified that she knew of this road sign and of the speed limit and that as the car approached such city limits

she admonished Haley to slow down "because he was going more than twenty-five."

Highway No. 6 passes through Harlowton and is one of the main highways of the state. At the time and place here involved such highway was dry, level and smooth. It extends in a south-easterly direction from the west city limits for approximately five or six blocks to a point where it crosses a street known as Avenue A at which place of intersection the highway curves and turns to the left and then extends in an easterly direction through the city.

To the south and east, being on the southerly side of this curve was the Ford Garage housed in a large building painted white which fronted on Avenue A from where it extended easterly along Highway No. 6 to an alley. In the northwest corner of the Ford Garage was a sheltered driveway wherein were located three white service station gasoline pumps and a white steel pole from which was suspended the "Ford" garage sign. In approaching such garage on and along said highway from the direction of the Muir ranch the driver of any automobile on crossing Avenue A, must either promptly change his course or stop his vehicle to avoid a collision with the garage and its equipment.

Helen Burbee testified that on the trip back to Harlowton she sat at about the middle of the front seat. When asked if the defendant Haley had both hands on the wheel all the time she answered "I don't know whether he did or not." She then was examined as follows: "Q. Do you know when you were coming into Harlowton whether the defendant had his arm around you in the front seat? A. I think he did; I don't know. Q. You think he did? A. Yes."

Gilbert Cameron testified Haley's car was travelling between 70 and 80 miles an hour as it entered the city limits and that it slowed down to approximately 50 miles an hour as it approached the turn at the Ford Garage. On the day following his crackup Haley told Highway Patrolman Robert Speer that he was going 40 to 50 miles per hour at the time his car hit

the Ford Garage but at the trial Haley testified that he was travelling at about 40 to 50 miles per hour as he passed the city limits sign and that he had slowed to 25 miles per hour as he approached the garage.

Haley failed to make the turn. His car collided with the steel pole near the gas pumps in front of the Ford Garage and continuing on, struck the corner of the garage and finally came to a stop some distance down the street at a point easterly from the garage.

Both doors on the right hand side of Haley's car were torn off and the center post between such doors was torn out. Vicki DeBotts, who was sitting to the right in the rear seat was thrown from the car and instantly killed. George Cameron was knocked unconscious. Haley at first did not show any immediate evidence of injury but later passed out and was taken to the hospital. Helen Burbee and Gilbert Cameron did not appear to be injured other than from shock. Two full cans of beer and an empty six pack beer carton were found in the wreckage of Haley's automobile.

While Haley was in the hospital, at approximately 1:30 or 2:00 o'clock that same morning, Dr. Asbury, the attending physician, took a sample of his blood which was sent to the State Board of Health at Helena for analysis. Haley orally consented to the taking of this sample before it was taken. According to the testimony of Mrs. Richards, the hospital superintendent, there had been some previous difficulties about blood tests for which reason a written consent was made out and this was read and signed by Haley in the presence of Dr. Asbury and Phyllis Kotan, a nurse, Dr. Asbury and Miss Kotan signed the document as witnesses. The consent (Exhibit 14) reads as follows:

"September 16, 1955.

[me]

"I understand that this test may be used as evidence against/

by the Montana Highway Patrol. I, Robert Haley, do hereby give my consent for a blood alcohol to be drawn.

"(Signed) .Bob Haley,
"16 Sept. 1955.

"Witness:
 "1. Phyllis A. Kotan, R.N.
 "2. William A. Asbury, M.D.
 "Time drawn, 2:00 A.M.,
 16 Sept. 1955
 "Drawn by W. A. Asbury, M.D."

The blood sample was transmitted to the State Board of Health, analyzed, and showed an alcohol concentration of 0.13 percent, which Matthew Klein, chemist of the State Board of Health, testified was high enough to indicate that Haley was under the influence of intoxicating liquor at the time his car collided with the garage in question.

The admission in evidence of the testimony of the witness Matthew Klein, and of other evidence based upon the blood test is specified as error but we find no merit in such specifications. In Breithaupt v. Abram, 352 U.S. 432, 77 S. Ct. 408, 410, 1 L. Ed. (2d) 448, the United States Supreme Court said:

"Basically * * * there is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician. To be sure, the driver here was unconscious when the blood was taken, but the absence of conscious consent, without more, does not necessarily render the taking a violation of a constitutional right; and certainly the test as administered here would not be considered offensive by even the most delicate. Furthermore, due process is not measured by the yardstick of personal reaction or the sphygmogram of the most sensitive person, but by that whole community sense of 'decency and fairness' that has been woven by common experience into the fabric of acceptable conduct. It is on this bedrock that this Court has established the concept of due process. The blood test procedure has become routine in our everyday life. It is a ritual for those going into

the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, through a longer, routine in becoming blood donors. Likewise, we note that a majority of our States have either enacted statutes in some form authorizing tests of this nature or permit findings so obtained to be admitted in evidence. We therefore conclude that a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' Rochin, supra [Rochin v. California] (342 U.S. [165], at [page] 172 [72 S. Ct. 205] at page 209, 96 L. Ed. 183), nor such a method of obtaining evidence that it offends a 'sense of justice,' Brown v. State of Mississippi, 1936, 297 U.S. 278, 285-286, 56 S. Ct. 461, 464-465, 80 L. Ed. 682, 686, 687. * * *

''The test upheld here is not attacked on the ground of any basic deficiency or of injudicious application, but admittedly is a scientific accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication. Modern community living requires modern scientific methods of crime detention lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield. The States, through safety measures, modern scientific methods, and strict enforcement of traffic laws, are using all reasonable means to make automobile driving less dangerous.

''As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. And the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses. Furthermore, since our criminal law is to no small extent justified by the assumption

of deterrence, the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions.''

Dr. Asbury, who took the blood sample, testified that Haley appeared to be in shock when first brought to the hospital but by the time the sample was taken he was conscious and knew what he was doing and not then in shock to any serious degree.

After Haley was brought to the hospital on a stretcher Phyylis Kotan, the attending nurse, put him to bed. She testified that Haley regained consciousness within a very short time after reaching the hospital, that he walked from the stretcher to the hospital bed and that he talked with her in a manner that was neither slurred nor incoherent.

After getting into the hospital bed, Haley orally consented to the drawing of a blood sample and he read and signed the written consent form, State's Exhibit 14, in the presence of Nurse Kotan.

When Haley took the witness stand at his trial he did not dispute or deny anything to which Dr. Asbury or Miss Kotan had testified and defendant's counsel at no time interrogated him concerning the blood test. Under the circumstances here shown there is no question but that the evidence concerning the taking, result and analysis of the blood sample was admissible. See State v. Duguid, 50 Ariz. 276, 76 Pac. (2d) 435; State v. Morkrid, Iowa 1939, 286 N.W. 412; State v. Small, 233 Iowa 1280, 11 N.W. (2d) 377.

Defendant contends that it was error for the trial court to admit evidence concerning Haley's drinking while enroute to Harlowton and concerning his driving in and about Harlowton and concerning his association with the two girls, Vicki DeBotts and Helen Burbee, except immediately prior to the collision with the garage. There is no merit in such specifica-

tions. That such evidence was admissible see State v. Gondeiro, supra, and State v. Souhrada, supra.

Defendant assigns as error the trial court's ruling excluding evidence of other crashes and wrecks alleged to have occurred at or about the same place on the highway where Haley wrecked his car but defendant failed and neglected to lay any foundation whatever for the introduction of such offered evidence. For all that appears in the record all of such other claimed accidents may have been the result of negligent and reckless driving, hence the offered evidence was properly excluded.

Defendant assigns as error the giving by the trial court over defendant's objections of certain of the court's instructions, and also the trial court's refusal to give others offered by defendant but we find no error in any of the instructions given to the jury nor do we find any prejudicial error in the trial court's refusal to give any of those offered by the defendant.

Finding no merit in any of defendant's specifications of error, the judgment of conviction entered on the jury's verdict and the trial court's order denying the defendant Robert Haley a new trial are hereby affirmed. Remittitur will issue forthwith.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICES CASTLES, BOTTOMLY and ANGSTMAN, concur.