STATE OF MONTANA, Plaintiff and Respondent, v. JAMES ROGER RANDALL, Defendant and Appellant.

No. 10107.

Submitted May 2, 1960. Decided July 8, 1960.

353 P.2d 1054.

Robert J. Boyd, Anaconda, appeared for and orally argued for appellant.

Forrest H. Anderson, Atty. Gen., Malcolm MacCalman, Deer Lodge, William F. Crowley, First Asst. Atty. Gen., appeared for and orally argued for respondent.

MR. JUSTICE ANGSTMAN delivered the Opinion of the Court.

Defendant, an inmate of the Montana State Prison, appeals from a judgment entered on a verdict of guilty of the crime of kidnapping with the intent to secretly confine. The verdict also found defendant had previously been convicted of a felony. It left the punishment to be fixed by the court and the verdict recommended leniency.

Counsel for defendant relies on the four following specifications of error:

1. Failure of the trial court to sustain defendant's demurrer to the information.

2. That the verdict and judgment are not sustained by the law or the facts.

3. Overruling and denying the defendant's motion for new trial.

4. Orally instructing the jury after submission of the case to the jury.

The offense charged herein arose out of an uprising inside the Montana State Prison at Deer Lodge at about 4:00 p.m. on April 16, 1959. According to the State's evidence, Lawrence E. Cozzens, a regular guard at the State Prison in charge of Cellhouse No. 2 returned from his lunch period at about 4:00 p.m. to relieve another guard, Victor Baldwin, who was in charge during Cozzens' absence. As Baldwin stepped out of the cellhouse to go to lunch he noticed a piece of material lying in the vestibule or on the steps. He picked it up and handed it to Cozzens. As he turned to leave, George Alton was standing there with a knife in his ribs and Baldwin and Cozzens were then surrounded by four inmates. The four were Jesse DeWeese, Jerry Myles, George Alton and the defendant Ran-

dall. All of the four inmates, according to Cozzens, were armed with knives. Baldwin could not see whether Randall had a knife as Cozzens was between him and Randall. Another inmate, by the name of Lee Smart, stood between the group and the door of the cellhouse holding a rifle.

The guards were then conducted by the above-named inmates to Cellhouse No. 1, which was in the control of another group of armed inmates, who had other captive guards and prison officials in a basement dungeon which was known as the "Hole". There the captives were kept for approximately an hour and a half or two hours, and then were taken out of the "Hole" two at a time and placed in a tier of cells on the ground floor facing west in the Cellhouse known as Gallery Two. Later they were moved to Gallery Six, the third tier of cells facing west, still two men to a cell, and later moved to the last two cells in the north end of the tier where all of the imprisoned officers were held in two cells.

During the second day of confinement the guards were allowed to write to their relatives to state that they were all right, but were forbidden to tell where in the prison they were being confined; they were permitted no other communication with the outside world.

Warden Floyd E. Powell, who had been Warden of the Montana State Prison since August 25, 1958, testified that about 4:15 p.m. on April 16, 1959, he received a phone call from the administrative assistant, John Simonsen, and was told there had been a stabbing within the prison and the Warden was needed; that he entered the main gate of the prison and went to the administration building where the defendant, armed with a knife, seized him and pulled him into the building. Other inmates present at that time were Lee Smart and Jerry Myles who had been present when Cozzens, the victim named in the information, was seized. They were later joined by inmate George Alton.

The defendant, and inmates John Ahlbin and Jesse DeWeese

testified in substance that defendant was a mere bystander and had nothing to do with the planning or execution of the seizure of Cozzens. Ahlbin also testified that defendant was not with Myles and Alton when Cozzens and Baldwin were moved through the dining hall area, and that he, Ahlbin, was the person who placed Cozzens and Baldwin in the cell known as the "Hole".

The defendant testified he was 22 years of age and eligible for parole in two weeks at the time of the uprising, and was returning from his job as a janitor in the mechanics school and started to hand his pass back to Cozzens when he, Cozzens and another guard, Victor Baldwin, were surrounded by the armed inmates who were the leaders of the uprising, viz., Jerry Myles, Jesse DeWeese, George Alton and Lee Smart; that after the seizure, the defendant entered an adjacent storeroom, took a quantity of tobacco and returned to his cell, stopping along the way to notify two other inmates, Donald Lee Smith and Clarence Dionne that there was some trouble downstairs and also to give them some of the tobacco.

The record shows that after the guards had been moved to the last cell defendant came to Cozzens and threatened to take his life. Defendant at that time was still carrying a knife.

All of the testimony shows that Cozzens and other officers and civilian employees were held in various cells in the new Cellhouse, as hostages and at no time was any effort made by the appellant, or any other inmate, to remove Cozzens from the Cellhouse or from the prison, and at all times the prison officials outside the walls knew that Cozzens and the other hostages were inside the walls but did not know the particular cells in which they were kept.

The charging part of the information reads as follows:

"That on or about the 16th day of April, 1959, and before the date of the filing of this Information, at and in the County of Powell, State of Montana, James Roger Randall, did then and there, wilfully deliberately, unlawfully and knowingly, forcibly seize and kidnap one Lawrence Cozzens with the in-

tent to secretly confine the said Lawrence Cozzens, within the State of Montana, all of which is contrary to the form, force and effect of the statute in such case made and provided and against the peace and dignity of the State of Montana.''

The offense of kidnapping under section 94-2602, R.C.M. 1947, reads as follows:

''If any person shall wilfully and without lawful authority, forcibly seize, confine, inveigle, decoy or kidnap any person, with intent to cause such person to be sent or taken out of this state, or to be secretly confined within the same against his will, or shall forcibly carry or send such person out of this state against his will, he shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding ten (10) years. Any person charged with such offense may be tried in any county into or through which the person so seized, inveigled, decoyed or kidnapped shall have been taken, carried or brought.''

Defendant contends that the information does not conform to section 94-6403, R.C.M. 1947, in that ''the facts constituting the offense'' of kidnapping with the intent to secretly confine are not set forth in ''ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended.''

He also contends that the information does not conform to the requirements of section 94-6405, R.C.M.1947, in that ''the particular circumstances of the offense charged'', and which are ''necessary to constitute a complete offense'', are not set forth.

■ The information properly charged the offense of kidnapping in the language of the statute. State v. Shannon, 95 Mont. 280, 285, 26 P.2d 360; State v. Haley, 132 Mont. 366, 318 P.2d 1084; State v. Duncan, 130 Mont. 562, 305 P.2d 761; State v. Driscoll, 101 Mont. 348, 54 P.2d 571. Formerly it was the practice to allow the defendant the right to apply and obtain a bill of particulars if he deemed the information insufficient as to details and facts, but the cases so holding were ex-

pressly overruled in State v. Bosch, 125 Mont. 566, 242 P.2d 477. The demurrer was properly overruled.

The information contained a statement of the facts constituting the offense charged in ordinary and concise language so as to enable a person of common understanding to know what was intended. That is all that the statute requires.

█ Specifications Nos. 2 and 3 are argued together upon the question of whether or not the State of Montana, in law and fact, proved the essential element of the crime alleged, namely, that defendant ''secretly confined'' the guard in question. Defendant contends that the confinement and imprisonment of the guard, Lawrence Cozzens, and all of the other so-called hostages, was not secret but intentionally disclosed and was a matter of common knowledge of the prison officials as all of the hostages were being held within the prison walls.

To ''secretly'' confine within the meaning of our statute means confinement against the will of the person confined which deprives him of the friendly assistance of the law to redeem himself from captivity.

The facts, viewed from the standpoint of the prosecution, show that Cozzens was seized by defendant and his associates, all of whom were armed with knives; that he was taken by a concealed route to an underground cell in another part of the prison from that where he was seized; that he and the other hostages were later moved from cell to cell and warned not to make their location known to persons outside the prison who desired to rescue them; that their lives were threatened if they made any attempt to escape or if the authorities attempted to rescue them; and that Cozzens and the other hostages were finally released through an armed assault by the National Guard and peace officers of the State. These facts were sufficient to show secret confinement.

In Smith v. State, 63 Wis. 453, 23 N.W. 879, 882, the court discussed the meaning of the words ''secret confinement'' and said: ''Secreting the prisoner, or carrying him out of the state,

or in some way depriving him of the ordinary means of securing his liberty, or, as is said in Russell, supra, 'depriving him of the friendly assistance of the laws to redeem himself from such his captivity', [1 Russell, Crimes, 591] are the ingredients of the offense.''

Other cases approving this definition of secret confinement are listed in 68 A.L.R. 712, and in the annotation on page 719. See particularly People v. Hope, 257 N.Y. 147, 177 N.E. 402; Doss v. State, 220 Ala. 30, 123 So. 231; State v. Myers, 154 Kan. 648, 121 P.2d 286; State v. Andre, 195 Wash. 221, 80 P.2d 553.

The verdict and judgment are sustained by both the law and the facts and there is no merit in defendant's contention as respects specifications of error 2 and 3.

The last specification of error is that relating to the instruction given by the court to the jury after the case had been submitted to the jury and after the jury had reported that the members were unable to agree on a verdict. The record reveals that at approximately 3:45 p.m. the jury commenced its deliberations and at 9:05 p.m., they returned to the courtroom and stated to the court that they could not reach a verdict. The court then read to the jury a long instruction. Most of the instruction was unobjectionable but it contained this language:

''Although the verdict to which a juror agrees must, of course, be his own verdict and the result of his own convictions, and not a mere acquiescence to the conclusions of his fellow jurors, yet, in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other. * * *

''In conferring together, you ought to pay proper respect to each others opinions and listen with disposition to be convinced of each others arguments, and, on the one hand, if a much larger number of your panel are for conviction, a dissenting juror

should consider whether the doubt in his own mind is a reasonable one, and which makes no impression on the minds of so many persons equally honest and equally intelligent as himself, and who have heard the same evidence and have paid the same attention, and have an equal desire in arriving at the truth, and under the sanction of the same oath, and, on the other hand, if the majority are for acquittal, the minority ought seriously to ask themselves whether they may not consider or alter the correctness of their judgment, which is not concurred in by most of those with whom they are associates, and discuss the weight or sufficiency of that evdience which fails to carry conviction in the minds of their fellows.''

Defendant contends that the foregoing instruction was prejudicial to him and constituted reversible error. There are cases supporting the practice of giving an instruction such as that complained of here. Thus in Commonwealth v. Tuey, 8 Cush., Mass., 1, the Supreme Judicial Court of Massachusetts upheld the lower court in giving an instruction similar to the one complained of here. The court said: ''The instructions went no further, than to say, that if any of the jury differed, in their views of the evidence, from a large number of their fellows, such difference of opinion should induce the minority to doubt the correctness of their own judgments, and lead them to a reexamination and closer scrutiny of the facts in the case, for the purpose of revising and reconsidering their preconceived opinions. In this view, the court did nothing more than to present to the minds of the dissenting jurors a strong motive to unanimity.

''Upon a careful consideration of these instructions, we are clearly of opinion, that so far from being improper, or of a nature to mislead, they were entirely sound, and well adapted to bring to the attention of the jury one of the means by which they might be safely guided in the performance of their duty.''

The rule of the Tuey case was approved by the Supreme Court of the United States in Allen v. United States, 164 U.S.

492, 17 S.Ct. 154, 41 L.Ed. 528, and in the following cases: Sevilla v. People, 65 Colo. 437, 177 P. 135; Olguin v. People, 115 Colo. 147, 170 P.2d 285, 287; Boggs v. U. S., 10 Okl. 424, 63 P. 969, 65 P. 927; State v. Voeckell, 69 Ariz. 145, 210 P.2d 972; State v. Craft, 85 Ariz. 143, 333 P.2d 728.

We prefer to take the opposite view. The Supreme Court of Arizona in the cases above-cited approved of the giving of such an instruction. However, Mr. Justice Udall in State v. Voeckell, supra, filed a strong dissenting opinion and pointed out the danger of such a practice.

Then in the later case of State v. Thomas, 86 Ariz. 161, 166, 342 P.2d 197, 201, the Supreme Court of Arizona took a contrary view from the former cases and condemned the giving of such an instruction as prejudicing the rights of defendant. The court in the Thomas case said:

"It now appears that its continued use will result in an endless chain of decisions, each link thereof tempered and forged with varying facts and circumstances and welded with the ever-changing personalities of the appellate court. This is not in keeping with sound justice and the preservation of human liberties and security. We are convinced that the evils far outweigh the benefits, and decree that its use shall no longer be tolerated and approved by this court."

The inevitable effect of the instruction would be to suggest to the minority members of the jury that they ought to surrender their own convictions and follow the majority. A vibrant, pulsating, intelligent minority is a part of our American way of life. The views of the minority often, with the passage of time, become the majority view as evidenced by the Arizona cases, supra. The majority view on any given subject is not always the correct view.

It is not in line with our practice to discourage jurors from taking a view contrary to that entertained by a majority of the jurors. It was error to give this instruction.

But the State contends that no objection was made to the

giving of the instruction and hence that we cannot review the question. The answer to this contention is that defendant had no opportunity to object to the giving of the instruction before it was given.

Much of the instruction, as above noted, was harmless. Defendant did not know of the harmful portion of the instruction until after it was given and of course it was then too late to make an objection. The harm had already been done. Because of the giving of this instruction a new trial should be granted.

The judgment is reversed and the cause remanded for a new trial.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICES BOTTOMLY and ADAIR concur.

MR. JUSTICE CASTLES dissenting.

I dissent. I agree with the majority opinion except as to the last specification of error. I do not agree that the giving of the instruction by the court without objection constitutes reversible error. The instruction was as favorable to the defendant as it was to the State, and, if an acquittal had been had, the defendant would have been happy.